**875 PARK AVENUE CO., Petitioner,**
v.
**COMMISSIONER OF INTERNAL
REVENUE, Respondent.**
No. 54, Docket 23070.

United States Court of Appeals
Second Circuit.

Argued Nov. 4, 1954.

Decided Dec. 6, 1954.

Aaron Holman, I. Newton Brozan, New York City, for petitioner.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, John J. Kelley, Jr., Sp. Assts to Atty. Gen., for respondent.

Before CHASE, MEDINA and HINCKS, Circuit Judges.

CHASE, Circuit Judge.

The taxpayer is a New York corporation which owns all of the stock of its subsidiary, the 1040 Park Avenue Corporation. The two corporations filed consolidated income tax returns for the year 1945 and the taxpayer claimed as a deduction under Section 23(f) and (g)(2) of the Internal Revenue Code, 26 U.S. C.A. § 23 (f), (g)(2), a loss to the subsidiary caused by alleged worthlessness of stock owned by it in the Park Avenue and 86th Street Corporation.

In 1923 the subsidiary erected an apartment house on its land at 86th Street and Park Avenue, New York City. After completion of the apartment house in 1924, the subsidiary caused the formation of the Park Avenue and 86th Street Corporation, hereinafter called the operating company, to which it conveyed the entire property. The operating company paid the subsidiary $2,510,200 for the property in the following way: It paid $750,000 in cash, took it subject to a $410,000 mortgage and issued to the subsidiary all of its common stock, consisting of 13,582 shares at a par value of $100 per share.

To raise the $750,000 in cash, the operating company borrowed that amount on a second mortgage to the bank which held the first mortgage. Thereafter the two mortgages were consolidated into one in the amount of $1,125,000, to bear interest at 5% payable semi-annually with amortization payments of $6,000, and in 1930 the mortgage was assigned by the mortgagee to the Union Dime Savings Bank.

The operating company took over the property for use as a cooperative apartment, with the stock entitling its purchasers to proprietary 5 year leases with 19 renewal periods of the same duration. In 1924 the subsidiary sold 26 of the building's 44 apartments, representing 7,873 shares of stock, and in 1925 took the remaining 18 apartments itself. Three of the 18 apartments were later surrendered to the operating company, and in 1945 the subsidiary held 15 apartments and 4,834 shares of the common stock.

On November 1, 1943, the principal of the operating company's debt to the bank was $1,015,446.14 and it owed a back balance of interest of $5,088.42 in addition to $10,154.46 interest due on that date. Failing to collect the amounts due, the bank brought foreclosure proceedings in the Supreme Court of New York County and on March 6, 1945, a judgment of foreclosure and sale was entered.

The bank purchased the property at the foreclosure sale for $500 and thereafter made a motion for an order confirming the sale and determining the amount of any deficiency against the operating company. The sale was confirmed by court order on September 25, 1945, and a referee was appointed to hear and report as to the fair market value of the premises for the purpose of determining the amount of a deficiency, if any. On October 30, 1945, the bank sold the property for $700,000.

The proceedings for a deficiency judgment were still pending on December 31, 1945, the last day of the year in which the taxpayer claims that the subsidiary's stock in the operating company became worthless, and on that date the operating company's balance sheet showed assets of $40,992.50 and liabilities of $768.01, which made the book value of the stock $4.65 per share. However, the taxpayer contends that this does not accurately reflect the condition of the company in 1945. It points out that then $32,947.09 of the assets represented an account receivable from the subsidiary which it is claimed would have to be treated as uncollectible because it apparently would have to be paid to the receiver of the property rather than to the operating company, and this reduced the book value of the stock to $.84 per share. Further, the prospective deficiency judgment would presumably amount to at least $400,000, the approximate difference between the principal debt and the price at which the bank sold the premis-

es, thus in practical effect utterly destroying any value in the stock. Therefore, it is argued that by any realistic appraisal of the stock as of December 31, 1945, it was worthless.

Where a deduction is sought for losses incurred due to stock becoming worthless, the taxpayer must show that it actually lost its value. It is not sufficient to show merely that its value shrank, though the shrinkage was extensive. If it had any recognizable value at all on the claimed date of loss there can be no deduction. Miami Beach Bay Shore Co. v. Commissioner, 5 Cir., 136 F.2d 408. Further, the taxpayer must show by some fixed and identifiable event or events, that the stock became worthless in the year for which the deduction is claimed. A subjective determination of worthlessness will not suffice. Boesel v. Commissioner, 2 Cir., 208 F.2d 817.

The two factors presented here by the taxpayer certainly fail to show any right to a deduction in 1945. Whether the stock had a book value on December 31, 1945, of $4.65 per share or only of $.84 per share is of no significance, for even if we accept the latter figure the stock still had value; only a great shrinkage had occurred. That there was a potential or prospective deficiency judgment of some $400,000 also fails to show worthlessness in 1945. As of December 31, 1945, no judgment of deficiency had been entered, nor was it certain that one would be entered in any amount, and the company was then solvent. Any determination of worthlessness at that time would be no more than a subjective forecast. In fact, reliance on a purely prospective deficiency judgment shows clearly that the fixed and identifiable event establishing worthlessness could occur only in some year after 1945.

Affirmed.