KENTUCKY FARM & CATTLE CO. AND SUBSIDIARIES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 62687. Filed September 30, 1958.

*William H. Harrar, Esq.*, for the petitioner.
*Clarence P. Brazill, Esq.*, for the respondent.

### OPINION.

FISHER, *Judge:* Respondent determined deficiencies against petitioner in consolidated income tax for the following years and in the following amounts:

| Year | Amount |
| --- | --- |
| 1950 | $1,747.17 |
| 1951 | 29,867.75 |

The year 1952 is also involved by way of carryback of unused excess profits credit. The questions presented are:

1. In determining the excess profits credit for the years 1950 and 1951, and the unused excess profits credit to be carried back from 1952 to 1951 of an affiliated group with one section 445 [1] subsidiary, where there were unrealized profits in 1949 and 1950 resulting from intercompany transactions consisting of sales of tobacco by the parent to its section 445 "new" corporation subsidiary, is petitioner entitled to have included in the parent's assets for 1949 and 1950 the amount of cash paid to the parent by the subsidiary, or to have included in

---

[1] All statutory references are to the Internal Revenue Code of 1939.

the subsidiary's inventory equivalent amounts reflected as net inventory increases by the subsidiary (represented by tobacco sold by the parent to the subsidiary), or both?

2. When computing the consolidated excess profits credit for the year 1951 and the consolidated unused excess profits credit ·for the year 1952 carried back to the year 1951, should the consolidated net taxable year capital addition be reduced by the separately computed net taxable year capital reduction of a "new" corporation (a section 445 subsidiary) where such "new" corporation had an excess of liabilities over assets?

3. Did a debt owed by a subsidiary to an individual become worthless at the close of 1950, and result in the receipt by the group of a net capital addition for 1951 and 1952 by reason of the alleged reduction thereby of the affiliated group's total liabilities?

All of the facts are stipulated and are incorporated herein by reference. The facts directly related to the specific issues raised are summarized under headings under which such issues are respectively considered. Other pertinent general facts are as follows:

Kentucky Farm & Cattle Co. (hereinafter referred to as Kentucky) is the common parent corporation of several subsidiary corporations which collectively filed consolidated income tax returns for the calendar years 1950, 1951, and 1952. The excess profits credit of the affiliated group was computed on the income method for all years here involved.

Among the wholly owned subsidiaries of Kentucky were John Alden Tobacco Co. (hereinafter referred to as Alden) and Northway Holding Co., Inc. (hereinafter referred to as Northway).

At all times herein material Kentucky was engaged, among other businesses, in the business of raising low-nicotine tobacco.

I. *Treatment of Unrealized Profits in Determining Excess Profits Credit.*

Alden was organized under the laws of Delaware on July 17, 1947, at which time all of its capital stock was issued to Kentucky. On October 1, 1947, and after the first day of its base period, Alden commenced a new business, namely, the manufacturing and merchandising of low-nicotine tobacco, and remained engaged in that business for all subsequent years. This business was not a continuation of a business theretofore carried on by Kentucky or any affiliate of the petitioner.

During 1949, Kentucky sold various quantities of raw low-nicotine tobacco to Alden for cash payments totaling $142,549.92. The effect of this on Alden's inventory resulting from this class of transaction was to produce a net increase of $96,274.08, computed as follows:

Alden's inventory at beginning of 1949_____ $130, 347. 41
Purchases from Kentucky during 1949_____ 142, 549. 92

272, 897. 33
Reduction for cost of tobacco used in Alden's sales to customers
during 1949_____ 46, 275. 84

Alden's inventory at close of 1949_____ 226, 621. 49
Less: Opening inventory_____ 130, 347. 41

Net increase in Alden's inventory_____ 96, 274. 08

During 1950, Kentucky sold various quantities of raw low-nicotine tobacco to Alden for cash payments totaling $181,615.45. The effect of this on Alden's inventory resulting from this class of transactions was to produce a further net increase of $161,214.79, computed as follows:

Alden's inventory at beginning of 1950_____ $226, 621. 49
Purchases from Kentucky during 1950_____ 181, 615. 45

408, 236. 94
Reduction for cost of tobacco used in Alden's sales to customers
during 1950_____ 20, 400. 66

Alden's inventory at close of 1950_____ 387, 836. 28
Less: Opening inventory_____ 226, 621. 49

Net increase in Alden's inventory_____ 161, 214. 79

In each of the consolidated returns filed by the petitioner for the years 1950, 1951, and 1952, application was duly made to obtain the benefits of section 445 of the Code of 1939 (relating to "new corporations") in respect to Alden.

In the returns referred to in the immediately preceding paragraph, the petitioner treated the 1949 payment of $142,549.92 and the 1950 payment of $181,615.45 (referred to above) wherever pertinent, as being component parts of consolidated equity capital in making computation of the relevant consolidated excess profits credit, the consolidated unused excess profits credit, the base period capital addition, and the consolidated net taxable year capital addition. In determining the deficiencies herein, the respondent eliminated from consolidated equity capital that portion of each year's tobacco payments received by Kentucky as was equal to the net increase in Alden's tobacco inventory for such year, to wit, $96,274.08 in respect to the year 1949 and $161,214.79 in respect to the year 1950.

Section 434 (a) grants a domestic corporation the right to compute its excess profits credit under sections 435 or 436, whichever results in the lesser tax. Petitioner used the income method provided by sec-

tion 435, made applicable to consolidated returns by section 141 and Regulations 129[2] promulgated thereunder.

The three component parts necessary to determine the excess profits credit computed under section 435 (a) (1) and section 24.31 (a) (59) are (1) the (consolidated) average base period net income, (2) the (consolidated) base period capital addition, and (3) the (consolidated) net taxable year capital addition or reduction. It is the latter two with which we are concerned at this point, there being no question as to the amount of the consolidated average base period net income.

In general, the base period capital addition is found by comparing, among other items, the yearly base period capital, i. e., the sum of equity capital on the first day of the first taxable year and other amounts not of present significance, with the corresponding yearly base period capital for certain specified years in the base period. See sec. 435 (f) (1) and (2) and sec. 24.31 (a) (67).

The net taxable year capital addition or reduction pursuant to section 435 (g) consists (in addition to factors not here material) of the net increase or decrease in equity capital in the taxable year over the equity capital at the beginning of the first year which is subject to the excess profits tax.

"Equity capital" as used in the above-described computations is defined in section 437 (c) as being the total assets of a taxpayer held in good faith for the purposes of the business, reduced by the total of its liabilities.

Section 445 of the Code provides an alternative method for computing the ABPNI of a new corporation, which, as the term is used in section 445, means a corporation which commenced business after the first day of its base period.

Generally speaking, the computation of ABPNI under section 445 consists of the application of an industry rate of return to the total assets of a corporation as of certain specified dates with certain adjustments.

The term "total assets" as used in section 445 has two meanings, depending on whether the new corporation meets the requirements of section 445 (b) (1) or (b) (2).

Section 445 (b) (1) applies to the determination of the excess profits credit for any of the first 3 taxable years of a new corporation ending after the base period. "Total assets" under section 445 (b) (1) (determined under subsection (c)) mean the sum of the cash and property held by the taxpayer in good faith for the purposes of the business, plus the net taxable year capital addition and minus the net taxable year capital reduction. (Such total assets are subject to a further adjustment, not here material, relating to interest.)

---

[2] All references are to Regulations 129 except as otherwise noted.

Section 445 (b) (2) applies to the determination of the excess profits credit of a new corporation other than one described in section 445 (b) (1) (i. e., new corporations whose third taxable year ends within the base period). "Total assets" under section 445 (b) (2) (as defined in section 442 (f)) mean the sum of the cash and property held in good faith for the purpose of the business. (Such total assets are subject to a further adjustment, not here material, relating to interest.)

It is clear that Alden is a section 445 (b) (2) corporation.

The present controversy arises over the inclusion in "equity capital" and "total assets" of the unrealized profits from the sale of tobacco by Kentucky (the parent) to Alden (the subsidiary).

At the outset, it should be noted that both parties agree that unrealized intercompany profits and losses resulting from transactions between members of the affiliated group should be eliminated when computing the consolidated net income. Such elimination of profits, which included the profits on the sale of tobacco by Kentucky to Alden, was made by petitioner on its returns for the years involved.

It has been stipulated that petitioner included such amounts in the consolidated equity capital of the group. It has also been stipulated that in determining the deficiencies herein, the respondent eliminated such unrealized profits from the consolidated equity capital of the group for the purpose of computing the excess profits credit for the years 1950, 1951, and the consolidated unused excess profits credit carried back from 1952 to 1951.

From the language of the stipulation, it is apparent that the parties have used the term "consolidated equity capital" as encompassing the term "total assets."

Respondent contends that a double benefit is given by allowing petitioner to include its unrealized profit in "consolidated equity capital."

Petitioner does not deny the existence of a double benefit but contends that such a result necessarily follows from the provisions of section 24.31 (b) (18) and (19) of Regulations 129.[3] Section

---

[3] Regs. 129, sec. 24.31 (b) (18).

*Base period capital addition.* In the computation of the consolidated base period capital addition, the following rules shall apply:

(i) If the consolidated average base period net income is the consolidated alternative average base period net income, the consolidated base period capital addition shall be computed as if the affiliated group did not include those members for which amounts computed under sections 442 (d), 443, 444, 445, or 446 are included in the consolidated alternative average base period net income, or for which a substitute excess profits net income under section 442 (c) is included in the consolidated alternative excess profits net income for any month in the first excess profits tax taxable year of the group or in the two immediately preceding taxable years. The consolidated base period capital addition computed under the preceding sentence shall be increased by an amount equal to the base period capital addition separately computed under section 435 (f) (3) (C)

24.31 (b) (18) provides that where the consolidated alternative average base period net income (referring to corporations which compute their credit under section 445) is used—

the consolidated base period capital addition shall be computed as if the affiliated group did not include those members for which amounts computed under * * * 445 * * * are included in the consolidated alternative average base period net income, * * *

Section 24.31 (b) (19) requires the same separative treatment when computing the net taxable year capital addition or reduction of a corporation using section 445 to compute its ABPNI.

Petitioner argues that if the affiliated group "did not include" Alden, the member "for which amounts computed under section 445 are included in computing the consolidated alternative average base period net income," then there can be only one permissible inference, i. e., for the two purposes of determining base period capital addition and net taxable year capital addition or reduction, Alden is to be treated as a separate company, rather than as a member of a consolidated group, so far as the rest of the group is concerned. Petitioner reasons therefrom that if Alden is not part of the consolidated group for these purposes, the situation is the same as if Kentucky had sold the tobacco to a stranger and that the basis of the tobacco to Alden should be the cost to Alden.

Reserving for consideration *infra* the fact that petitioner's argument appears inconsistent with the fundamental concept that the consolidated return is intended to reflect the true tax picture of the entire group, petitioner overlooks the very reason for the language relied upon in section 24.31 (b) (18) and (19) and fails to take cognizance of other controlling laws and regulations.

In general, a corporation which commenced business after the beginning of the base period may elect to use the relief provisions of

---

for any member of the group for which a substitute excess profits net income computed under section 442 (c) (1) was included in the consolidated alternative excess profits net income for any month in the second taxable year preceding the first excess profits tax taxable year of the group.

Regs. 129, sec. 24.31 (b) (19).

*Net capital addition or reduction in case section 443 or 445 is applicable.* If the consolidated average base period net income is the consolidated alternative average base period net income, the consolidated net capital addition or reduction shall be computed as if the affiliated group did not include those members for which amounts computed under section 443 or section 445 are included in computing the consolidated alternative average base period net income. If the consolidated average base period net income is the consolidated section 435 (e) average base period net income, the consolidated net capital addition or reduction shall be computed as if the group did not include those members for which amounts computed under section 445 are included in computing the consolidated section 435 (e) average base period net income. The consolidated net capital addition or reduction so computed in either instance shall be properly increased or decreased, as the case may be, by the net capital addition or reduction separately computed for each such member.

section 445 [4] to compute its average base period net income. The average base period net income under the provisions of section 445 is arrived at by applying an industry rate of return to the total assets as of certain specified dates.

Alden computed its average base period net income under the provisions of section 445 (b) (2), relating to taxpayers whose third taxable year ends during the base period. An industry rate of return is applied to the total assets of Alden as of the end of the year 1949 and certain interest adjustments, not here pertinent, are made.

---

[4] SEC. 445. AVERAGE BASE PERIOD NET INCOME—NEW CORPORATION.

(a) NEW CORPORATION.—A taxpayer which commenced business after the first day of its base period shall, except as provided in subsection (g), be considered a new corporation for the purposes of this section, and its average base period net income determined under this section shall be the amount computed under subsection (b).

(b) AVERAGE BASE PERIOD NET INCOME.—The average base period net income of a new corporation determined under this section shall be computed as follows:

(1) For the purpose of determining the excess profits credit for any of the taxpayer's first three taxable years which is a taxable year under this subchapter—

(A) By multiplying the amount of the total assets for such taxable year (determined under subsection (c)), held by the taxpayer in good faith for the purposes of the business, by the base period rate of return, proclaimed by the Secretary under section 447, for the taxpayer's industry classification.

(B) By subtracting from the amount ascertained under subparagraph (A) the total interest paid or incurred by the taxpayer for the 12 months ending with the last day of such taxable year.

(2) For the purpose of determining the excess profits credit for any taxable year under this subchapter other than a taxable year described in paragraph (1)—

(A) By multiplying the amount of the taxpayer's total assets (as defined in section 442 (f)) for (i) the last day of its taxable year immediately preceding its first taxable year under this subchapter, or (ii) the last day of its third taxable year, whichever day is later, by the base period rate of return, proclaimed by the Secretary under section 447, for the taxpayer's industry classification.

(B) By subtracting from the amount ascertained under subparagraph (A) the total interest paid or incurred by the taxpayer for the 12 months ending with whichever day is used under such subparagraph.

For the purposes of this section, the taxable year of the taxpayer in which it commenced business and its two succeeding taxable years shall be considered to be its first three taxable years.

(c) TOTAL ASSETS FOR FIRST THREE YEARS.—The amount of the total assets for any taxable year referred to in subsection (b) (1) shall, for the purposes of such subsection, be the sum of

(1) the total assets (as defined in section 442 (f)) for the last day of the taxpayer's taxable year immediately preceding its first taxable year under this subchapter, and

(2) the net capital addition (determined under section 435 (g)) for such taxable year referred to in subsection (b) (1),

minus the net capital reduction (determined under section 435 (g)) for such taxable year referred to in subsection (b) (1).

\*  \*  \*  \*  \*  \*  \*

(e) CAPITAL ADDITION OR REDUCTION.—If the average base period net income of the taxpayer is determined under this section—

(1) the excess profits credit for any taxable year for which such determination is made under subsection (b) (1) shall not include any net capital addition or reduction determined under section 435 (g), and

(2) in computing the net capital addition or reduction under section 435 (g) for any taxable year for which such determination is made under subsection (b) (2), the expression "the first day of the taxpayer's first taxable year under this subchapter" shall be read as "the first day of the taxpayer's first taxable year under this subchapter or the day following the close of the taxpayer's third taxable year, whichever day is later."

Since the application of the industry rate of return to total assets necessarily would reflect the effect of capital expansion of a taxpayer during the base period, no separate base period capital addition is computed for a corporation using section 445. See Regs. 130, sec. 40.445-2 (c).

The separative requirements of 24.31 (b) (18) apply the logic of section 445 to consolidated returns. Since there is no base period capital addition as such with respect to a section 445 corporation (such base period capital addition having been reflected in the application of the industry rate of return to its total assets), the remaining members of the group compute their base period capital addition as if Alden were not a member of the group. We think it apparent that the separative requirements of 24.31 (b) (18) are intended to and do prevent any duplication of the assets of Alden against which an industry rate of return is applied, and the assets of the remaining members of the group, in the computation of base period capital addition.

Similarly, the provisions of 24.31 (b) (19) were designed primarily to prevent a duplication of benefits where there is a new corporation in the group computing its ABPNI under section 445 (b) (1). The latter section applies to a corporation whose third taxable year ends subsequent to its base period. The computation of ABPNI requires, under section 445 (b) (1), that the total assets (as determined under section 445 (c)) be computed as of the end of the year 1949 and further that the net capital addition shall be added to, and the net capital reduction shall be subtracted from, such total assets for any of the taxpayer's first 3 taxable years which is an excess profits taxable year. The foundation for the section 24.31 (b) (19) approach in this respect is to be found in section 445 (e) (1) which provides that where ABPNI is determined under section 445 (b) (1), the excess profits credit for the taxable year for which such determination is made shall not include any net capital addition or reduction. The reason for this provision is that the ABPNI computed under section 445 (b) (1) itself takes into account such net capital addition and reduction. This view is further supported by H. Rept. No. 3142, 81st Cong., 2d Sess., in which the following statement is made at page 56:

To prevent duplication of benefit, provision is made in subsection (f) [445 (e)] for the elimination of any base period capital additions or reductions and capital changes made prior to the date upon which the taxpayer's total assets are taken into account. Capital additions and reductions, made after the date on which total assets are computed, are, however, available to the taxpayer as in any other case. * * *

Thus, the purpose of section 24.31 (b) (19) is analogous in principle to that of section 24.31 (b) (18), each reflecting the objective of avoidance of duplicated benefits.

Turning our attention to the facts as presented, Alden, at the end of 1949, computed its average base period net income under the provisions of section 445 (b) (2). Alden, apparently relying on section 24.31 (b) (18), included the tobacco purchased from Kentucky as a part of its total assets at its own cost, or, as stated in the stipulated facts, at its net increase in inventory, namely, $96,274.08. At the same time, Kentucky included in its equity capital an equivalent amount, represented by cash paid to it by Alden for such tobacco. The issue is whether Kentucky or Alden or both are entitled to include said amount in equity capital and total assets, respectively, as steps in determining the correct excess profits credit.

We think the key to the solution is to be found in the proper basis of the tobacco to Alden. As above noted, section 445 (b) (2) refers to section 442 (f) for the definition of total assets. Section 442 (f) states that total assets mean cash and property held at the end of a given day in good faith for the purposes of the business. Such property is held at its adjusted basis for determining gain. Regs. 130, sec. 442–3 (d).

For consolidated return purposes, the adjusted basis is determined under sections 24.38 (a) and (b), which are as follows:

Sec. 24.38. Basis of property—(a) *General rule.* Subject to the provisions of paragraphs (b) and (c) and except as otherwise provided in sections 24.34 and 24.39, the basis during a consolidated return period for determining the gain or loss from the sale or other disposition of property, or upon which exhaustion, wear and tear, obsolescence, amortization, and depletion are to be allowed, shall be determined and adjusted in the same manner as if the corporations were not affiliated (see sections 111 to 115, inclusive), whether such property was acquired before or during a consolidated return period. Except as otherwise provided in section 24.39, such basis immediately after a consolidated return period (whether the affiliation has been broken or whether the privilege of making a consolidated return is not exercised) shall be the same as immediately prior to the close of such period.

(b) *Intercompany transactions.* The basis prescribed in paragraph (a) shall not be affected by reason of a transfer during a consolidated return period, other than upon liquidation as provided in (c) (whether by sale, gift, dividend, or otherwise) from a member of the affiliated group to another member of such group.

The plain import of the language of the regulations is that the basis to the affiliated group during a consolidated return period for determining gain or loss shall be the original cost of the asset to the affiliated group, i. e., the original cost to the member of the group which first produced the asset or first acquired it from a nonmember, subject to the adjustments provided for in sections 111 to 115, inclusive. Such basis is not affected by an intercompany transfer. The basis to Alden, then, of the tobacco purchased from Kentucky, to the

extent here in issue in relation to the treatment of unrealized profits, should be the "adjusted basis for determining gain."

This interpretation of section 24.38 (a) and (b) is supported in principle by *Packard Motor Car Co.* v. *United States*, 69 Ct. Cl. 570, 39 F. 2d 991, 997 (1930), certiorari denied 282 U. S. 848 (1930). Moreover, section 24.39 (d) applies the same rule with particularity to inventory items during certain specified periods of time, among which is the consolidated base period, which encompasses 1949. That section provides that proper adjustment with respect to unrealized profits or losses in transactions between affiliated corporations shall be made in the opening and closing inventories of each affiliated corporation in the transaction. Again, this required Alden to carry the tobacco at Kentucky's basis.

The issue, as we have stated it above, was whether Kentucky or Alden, or both, were entitled to include the $96,274.08 in equity capital and total assets, respectively, as steps in the computation of the correct excess profits credit. On the basis of the foregoing discussion, we hold that in determining Alden's total assets as of the end of the year 1949, the purported net increase of $96,274.08 in Alden's inventory is to be taken as zero, but the cash in a like amount paid by Alden to Kentucky is properly includible as part of Kentucky's equity capital.

During 1950, Alden made similar purchases of tobacco from Kentucky. The unrealized profit, or, as stated in the stipulation of facts, the net increase in Alden's inventory was $161,214.79. Alden, apparently relying on the provisions of section 24.31 (b) (19), included the tobacco purchased from Kentucky as part of its equity capital at its own cost. Kentucky included in its equity capital an equivalent amount, represented by the cash paid to it by Alden. The issue presented is whether Kentucky or Alden, or both, are entitled to include this amount in their respective computations of equity capital for the purpose of determining their respective net taxable year capital additions or reductions.

Again, we think the solution to this issue is to be found in the proper basis of the tobacco to Alden.

Since Alden computes its credit under section 445 (b) (2), it is allowed to compute a net capital addition or reduction for the taxable year in question under section 445 (e) (2). This latter section does not provide for the computation of the credit but refers to section 435 (g) for such determination.

Computations under section 435 (g) require comparison between equity capital at certain points in time. As already noted, section 437 (c) defines "equity capital," in essence, as total assets minus total liabilities. The definition, however, goes further and states:

For such purposes, the amount attributable to each asset shall be determined by ascertaining the adjusted basis thereof (or, in the case of money, the amount thereof) and the adjusted basis shall be the adjusted basis for determining gain upon sale or exchange. * * *

The adjusted basis for determining gain upon sale or exchange is governed by the provisions of section 24.38 (a) and (b) of Regulations 129, discussed, *supra*, and the same conclusion is reached as to the basis of this tobacco to Alden.

In applying the foregoing discussion to the facts as presented, we hold that in determining Alden's equity capital for the purpose of computing the net taxable year capital addition or reduction for the year 1951, the purported increase in Alden's inventory ($161,214.79) is to be taken as zero. Assuming for the purpose of discussion that Alden and Kentucky had no other business transactions affecting their respective computations of equity capital for the year in question, it is clear that Alden would have a net taxable year capital reduction of $161,214.79. An equivalent amount of cash, however, came into Kentucky's hands from Alden resulting in a capital addition to Kentucky. The capital reduction of Alden will, in effect, be subtracted from Kentucky's capital addition resulting in a practical washout of the transaction from the standpoint of the group. This washout is required by the last sentence of section 24.31 (b) (19), which states:

The consolidated net capital addition or reduction so computed in either instance shall be properly increased or decreased, as the case may be, by the net capital addition or reduction separately computed for each such member.

We noted earlier in our discussion that section 24.31 (b) (19) was primarily designed to prevent a duplication of benefit to a corporation computing its ABPNI under section 445 (b) (1). It is also apparent, however, that computations of the net taxable year capital addition or reduction for all section 445 corporations (where such computations are required) are governed by this regulation, the language of which we think is clear and properly controlling.

At this point, it is well to note the foundation of petitioner's position on the whole issue. In essence, petitioner argues that the provisions of section 24.31 (b) (18) and (19) require that the basis to Alden of the tobacco purchased from Kentucky be the cost to Alden since Alden is to be treated, for these purposes, as if it were a stranger and not a member of the affiliated group. Petitioner suggests that the underlying reason for the separate computations to be made under these regulations is that respondent, himself, has recognized that section 445 is a relief provision and that its purpose is to aid a new and struggling enterprise. In effect, petitioner argues that some equitable consideration inherent in section 445 requires, or at least justifies, the proposition that computations under section 24.31 (b)

(18) and (19) are intended to reflect petitioner's desired result, namely, a stepped-up basis. The clear implication to be drawn from this approach is that, but for petitioner's theory of section 445, the basis of the tobacco to Alden would be as we have found it, namely, Kentucky's basis. Since we find petitioner's theory unacceptable, there appears no reason for altering our determination of the basis of the tobacco to Alden.

Furthermore, there is an additional section of the consolidated regulations which contradicts the implications of petitioner's position and at the same time supports our own views as expressed above. Section 24.31 (b) (2) states:

> (2) *Other computations on separate basis.* The various other computations required by these regulations to be made by the several affiliated corporations shall be made in the case of each such corporation in the same manner and under the same conditions as if a separate return were to be filed, but with the following exceptions: * * *

One of the exceptions is (b) (2) (xxvii) which provides as follows:

> (xxvii) *Base Period capital addition and net capital addition or reduction if alternative average base period net income is used.* In computing the base period capital addition or the net capital addition or reduction of a member of the group for the purpose of determining the consolidated base period capital addition or the consolidated net capital addition or reduction if the consolidated alternative average base period net income is used, the items involved in such computation shall be properly adjusted to reflect the amounts thereof which would be included in computing the consolidated base period capital addition or the consolidated net capital addition or reduction if such consolidated alternative average base period net income were not used. * * *

We think that this regulation serves to dispel any doubts with respect to our treatment of both the 1949 and 1950 transactions. It is consistent with the separate computations to be made under section 24.31 (b) (18) and (19) but requires that the *items involved in such separate computation* be adjusted as if Alden were not using section 445 to compute its ABPNI. We think it can only be interpreted to mean that while separate computations under 24.31 (b) (18) and (19) are to be made, for the reasons above stated, the items thus separately computed shall be accounted for and adjusted in accordance with the fundamental principles applicable to consolidated returns for a group whose members do not contain a section 445 corporation. It follows that petitioner's premise and conclusion are groundless and that the purported net increases in Alden's inventory arising out of both the 1949 and 1950 transactions with Kentucky are to be taken as zero. Correlatively, the equivalent amount of cash in the hands of Kentucky became part of the assets of Kentucky for the purposes of computing its base period capital addition and its taxable

year net capital addition or reduction, subject, of course, to the group adjustments required by 24.31 (b) (19).

In making our position clear with respect to both the 1949 and 1950 tobacco transactions between Kentucky and Alden, we thought our views would be better understood if the 2 years were discussed separately, in the background of the circumstances applicable respectively to each. To the extent possible, therefore, we deferred up to this point a discussion of the fundamental concept of the consolidated return as related to petitioner's contention. We, therefore, add, at this point, a brief exposition of our views in this respect.

The purpose of the consolidated return is to reflect the true tax picture with respect to the entire affiliated group. From this perspective, it is apparent that unrealized profits or losses resulting from intercompany transactions must be eliminated. A necessary correlative to that rule is that the basis of an asset transferred in an intercompany transaction where profit or loss is eliminated must be the same to all members of the group involved in the transaction. Since nothing has left or has come into the group as a result of the sale by Kentucky to Alden, the original cost or adjusted basis to the group is not affected. *Packard Motor Car Co.* v. *United States, supra.*

In this sense, the principles here involved do not differ substantially from those announced in *Bangor & Aroostook R. Co.* v. *Commissioner*, 193 F. 2d 827 (C. A. 1, 1951), certiorari denied 343 U. S. 934 (1952), affirming 16 T. C. 578, in which the court held that income realized, but not recognized for tax purposes, could not be reflected in the accumulated earnings and profits of a corporation to produce the effect of increasing its excess profits tax credit. In the instant case, the unrealized intercompany profit, although here considered in the perspective of determining the excess profits credit, is akin to the unrecognized income in the *Bangor* case. As such, it cannot be permitted to bring about a duplicated benefit (conceded by petitioner to arise under its theory) by inclusion of the cash (arising out of the sale from Kentucky to Alden) in Kentucky's equity capital and at the same time by increasing Alden's inventory in an equivalent amount, which was Alden's cost (but not Kentucky's basis) in the intercompany sale from Kentucky to Alden.

It is apparent from our entire discussion that we have, in substance, reached the same basic result as did the respondent. Although the mechanics of our approach differ from those of respondent, the principles underlying both views, so far as they are significant in the instant case, are the same. Under the circumstances, subject to such adjustments as may be necessary under Rule 50 to reflect our views, we therefore sustain respondent's determination on this issue.

## II. *Use of Equity Capital in Amount Less Than Zero.*

Alden's financial situation at January 1, 1950, January 1, 1951, and January 1, 1952, is shown by the following table:

| | January 1— | | |
|---|---|---|---|
| | 1950 | 1951 | 1952 |
| Assets: | | | |
| Cash | $10, 825. 92 | $4, 319. 23 | $3, 497. 70 |
| Accounts receivable | 6, 171. 28 | 3, 173. 42 | 2, 430. 02 |
| Inventories | 271, 007. 05 | 431, 390. 55 | 377, 753. 76 |
| Prepaid expenses | 1, 409. 46 | 1, 136. 85 | 968. 28 |
| Total assets | 289, 413. 71 | 440, 020. 05 | 384, 649. 76 |
| Liabilities: | | | |
| Accounts payable | 2, 641. 59 | 1, 479. 53 | 4, 605. 77 |
| Intercompany accounts payable | 440, 000. 00 | 636, 615. 45 | 664, 115. 45 |
| Accrued expenses: | | | |
| As of Dec. 31, 1951 | | | 5, 066. 02 |
| Sundry taxes payable | 1, 380. 65 | 527. 70 | 400. 99 |
| Other | | 887. 04 | 529. 29 |
| Total liabilities | 444, 022. 24 | 639, 509. 72 | 674, 717. 52 |
| Capital deficiency (excess of liabilities over assets) | 154, 608. 53 | 199, 489. 67 | 290, 067. 76 |

Increase in capital deficiency between Jan. 1, 1950, and Jan. 1, 1951: $44,881.14.
Increase in capital deficiency between Jan. 1, 1950, and Jan. 1, 1952: 135,459.23.

In computing the consolidated excess profits credit for 1951 and the consolidated excess profits credit for 1952, petitioner treated Alden as having taxable year capital reductions of zero. Respondent, in determining the deficiencies herein, determined taxable year capital reductions for Alden of $44,881.14 for 1951 and $135,459.23 for 1952.

Petitioner states the issue on brief as follows:

Respondent says the difference between the 1951 negative capital and the 1950 negative capital produces a 1951 net capital reduction of $44,881.14, and the difference between the 1952 negative capital and the 1950 negative capital produces a 1952 net capital reduction of $135,459.23. Petitioner says that since Alden never had any equity capital within the meaning of Section 437 (c), it could not suffer a capital reduction merely because the original minus was less than the later minus amounts.

It would serve no useful purpose here to enter upon the elaborate discussion which would be necessary if we were to present our views fully. The same issue was presented to us in *Mid-Southern Foundation*, 28 T. C. 918 (1957), on appeal (C. A. 6), in which we upheld respondent's contention and distinguished *Thomas Paper Stock Co.*, 22 T. C. 1294 (1954), on which petitioner places his reliance. Petitioner, in the instant case, does not argue that *Mid-Southern Foundation* is not in point, and urges only that we erred in that case.

We have carefully reviewed *Mid-Southern Foundation*, and are convinced that the views therein expressed are correct. We accordingly follow it and sustain respondent's contentions herein.

### III. *Northway's Indebtedness to Salmon.*

Northway was incorporated in New York in 1919. On December 20, 1919, it acquired from Nevada Realty Co. a long-term lease of an apartment house know as The Nevada, located at 69th Street and Broadway, New York City. Walter J. Salmon was president of Kentucky and was president of Northway throughout most of its existence, but held no stock or official position in or with Nevada Realty Co. Prior to April 26, 1932, Walter J. Salmon owned all of the stock of Kentucky. After that date, of the 167 shares of Kentucky outstanding, he owned 54 shares outright, and the remaining 113 shares were owned by a trust established by him with himself as trustee on April 26, 1932.

Upon receiving the assignment of the lease, Northway gave its mortgage, secured by the lease, to Nevada Realty Co. in the amount of $209,100. The mortgage was guaranteed by Walter J. Salmon. Thereafter Northway entered into possession, made extensive structural alterations at substantial cost to itself, and proceeded to operate the building, renting to various tenants the stores, offices, and apartments therein. By careful and efficient operation, Northway made profits sufficient to enable it to meet regularly its obligations on the mortgage, and by August 3, 1931, the mortgage had been satisfied of record.

The fee of The Nevada was owned by the Curtiss Securities Company. On February 7, 1925, Hamilton Leasing Co., Inc., a New York corporation organized and owned by Walter J. Salmon, bought the fee from Curtiss. Three days later Hamilton mortgaged the fee to Title Guarantee & Trust Co. for $1,000,000, which mortgage was later acquired by Mutual Life Insurance Co.

With the onset of the depression, Hamilton began to have trouble meeting its obligation on the mortgage. On February 16, 1932, in anticipation of the commencement of foreclosure proceedings by Mutual Life, Northway surrendered its lease to Hamilton. On June 15, 1932, the premises were sold under foreclosure.

Northway's financial condition at the end of 1932, after the surrender of its lease, was as follows:

ASSETS

| | |
|---|---|
| Rents receivable | $7,539.11 |
| Claims for past due rent and for rent due from unexpired terms of subleases | 203,404.84 |
| Total assets | 210,943.95 |

LIABILITIES

| | |
|---|---|
| Accounts payable | $4,470.84 |
| Real estate taxes payable | 17,680.00 |
| Indebtedness to Walter J. Salmon | 129,343.37 |
| Capital stock | 500.00 |
| Surplus | 58,949.74 |
| Total liabilities | 210,943.95 |

Throughout the corporate existence of Northway, Walter J. Salmon made a number of loans to the company on open account. Prior to 1932, because of repayments and additional advances, this account fluctuated, as shown by the following table (to the nearest dollar):

| December 31— | Due to W. J. Salmon | Due from W. J. Salmon |
|---|---|---|
| 1925 | $386 | |
| 1926 | 8,638 | |
| 1927 | 7,291 | |
| 1928 | | $3,886 |
| 1929 | 52,105 | |
| 1930 | | 10,597 |
| 1931 | 48,270 | |
| 1932 | 129,343 | |

Following the surrender of Northway's lease, its accounts receivable, consisting of claims against tenants for rent arrearages, and for rentals covering the various unexpired terms of tenants out of possession, were turned over to an attorney for collection. The remainder of the moneys collected by the attorney after State and Federal taxes, legal and collection expenses, was turned over to Walter J. Salmon in partial repayment of his advances to Northway. The following table shows those transactions by years:

*Disbursement on behalf of Northway Holding Co.*

| Year | Gross collections | Legal and collection expenses | State tax | Federal tax | Miscellaneous |
|---|---|---|---|---|---|
| 1933 | $1,411.36 | $851.10 | | | $14.00 |
| 1934 | 758.00 | 693.15 | | | |
| 1935 | 718.33 | 2,143.90 | | | |
| 1936 | 429.00 | 2,709.12 | | | |
| 1937 | 2,267.63 | 1,317.05 | | | |
| 1938 | 579.40 | 395.16 | | | |
| 1939 | 1,164.70 | 705.21 | | | |
| 1940 | 272.86 | 209.68 | | | 61.25 |
| 1941 | 35.98 | 100.30 | $127.00 | | |
| 1942 | 1,220.00 | 741.22 | 12.00 | | |
| 1943 | 220.00 | 130.50 | 12.80 | | |
| 1944 | 370.00 | 226.50 | 12.90 | | |
| 1945 | 3,630.50 | 2,268.61 | 11.00 | | |
| 1946 | 975.00 | 594.25 | 10.35 | $636.61 | |
| 1947 | 247.75 | 611.47 | 10.60 | 75.74 | |
| 1948 | 8,625.00 | 5,885.33 | 10.15 | | |
| 1949 | 542.00 | 494.77 | 10.30 | 1,061.09 | |
| 1950 | 355.00 | 156.36 | 15.55 | 17.22 | |
| Total | 23,822.51 | 20,233.68 | 232.65 | 1,790.66 | 75.25 |

The books of Northway show that, of the original claims against tenants amounting to $203,404.84, collections totaling $23,467.51 were made between January 1, 1933, and the close of 1949, and that claims aggregating $82,408.66 were written off in years and amounts as follows:

| | | | |
|---|---|---|---|
| 1933 | $36,452.50 | 1943 | $1,306.66 |
| 1934 | 4,784.84 | 1944 | 7,756.11 |
| 1935 | 5,486.30 | 1945 | 1,462.50 |
| 1936 | 3,042.00 | 1947 | 2,200.00 |
| 1937 | 3,700.00 | 1948 | 6,395.00 |
| 1938 | 1,860.26 | 1949 | 275.00 |
| 1939 | 6,999.99 | | |
| 1940 | 687.50 | Total—1933–1949 | 82,408.66 |

At the close of 1949 claims amounting to $97,528.67 remained on Northway's books as open, outstanding, and uncollected.

Northway was completely liquidated on December 29, 1950, and finally dissolved shortly thereafter. On the day of liquidation, it owed Walter J. Salmon $127,853.10, but had no assets other than the remaining balance of the claims in the amount of approximately $97,000 with which to pay this debt, and such debt was not assumed by the transferee in liquidation. The books and records of Northway and its transferee in liquidation show no further collections on the claims after 1950. The transferee in liquidation was a corporation wholly owned by petitioner.

In computing consolidated equity capital at January 1, 1951, and January 1, 1952, in order to determine the taxable year net capital addition components of the consolidated excess profits credit for 1951 and the consolidated unused excess profits credit for 1952, petitioner eliminated Northway's indebtedness aforesaid as a liability at the dates aforesaid, but treated such indebtedness as being in existence in full as of January 1, 1950, thereby producing a capital addition to the extent of the indebtedness petitioner claims to have been eliminated on liquidation of Northway. Respondent, in determining the deficiencies herein, reduced consolidated equity capital at January 1, 1951, and January 1, 1952, by $127,853.10, the amount of Northway's indebtedness aforesaid, consistent with respondent's determination that this debt became worthless prior to 1950.

Under the provisions of section 435 (g),[5] the net taxable year capital addition for 1951 and 1952 is determined by finding, among other

---

[5] SEC. 435. EXCESS PROFITS CREDIT—BASED ON INCOME.

(a) AMOUNT OF EXCESS PROFITS CREDIT.—The excess profits credit for any taxable year, computed under this section, shall be—

\* \* \* \* \* \* \*

(g) NET CAPITAL ADDITION OR REDUCTION.—

(1) NET CAPITAL ADDITION.—The net capital addition for the taxable year shall \* \* \* be the excess,

things, the excess, if any, of equity capital at January 1, 1951, and again at January 1, 1952, over equity capital at January 1, 1950. Since section 437 (c)[6] defines equity capital at any time as the total of assets held for business purposes reduced by the total liabilities at such time, if a liability exists at January 1, 1950, but is gone at January 1, 1951, or 1952, there is a net increase of equity capital addition, as between January 1, 1950, and either of the two subsequent dates.

In the light of the foregoing, the resolution of the issue before us depends, for practical purposes, upon whether petitioner has established, upon the stipulated facts, that the indebtedness was in existence in full as of January 1, 1950 (or, in other words, was not worthless on that date), but was worthless at the time of liquidation on December 29, 1950. There is no suggestion that the debt may have become worthless at some date subsequent to December 29, 1950, which might nevertheless be material here, if established.

Respondent determined that the debt was not a true liability as of January 1, 1948. If that view is correct, he must be sustained. We think the stipulated facts are inconsistent with this determination in the light of the gross collections in 1948. This view, however, does not relieve petitioner of meeting the burden, essential to its case, of proving that the debt was not worthless on January 1, 1950, but was worthless on December 29 of that year. See *Helvering* v. *Taylor*, 293 U. S. 507, 514 (1935). See also *Millar Brainard*, 7 T. C. 1180, 1184, 1185 (1946).

We accept, *arguendo*, petitioner's claim that the debt due Salmon by Northway was not worthless on January 1, 1950. We find, however,

---

divided by the number of days in the taxable year, of the aggregate of the daily capital addition for each day of the taxable year over the aggregate of the daily capital reduction for each day of the taxable year. * * *

*    *    *    *    *    *    *

(2) NET CAPITAL REDUCTION.—The net capital reduction for the taxable year shall * * * be the excess, divided by the number of days in the taxable year, of the aggregate of the daily capital reduction for each day of the taxable year over the aggregate of the daily capital addition for each day of the taxable year * * *

*    *    *    *    *    *    *

(3) DAILY CAPITAL ADDITION.—The daily capital addition for any day of the taxable year shall * * * be the sum of the following:

*    *    *

(B) The amount, if any, by which the equity capital (as defined in section 437 (c)) at the beginning of the taxable year exceeds the equity capital at the beginning of the taxpayer's first taxable year under this subchapter.

*    *    *    *    *    *    *

(4) DAILY CAPITAL REDUCTION.—The daily capital reduction for any day of the taxable year shall * * * be the sum of the following:

*    *    *    *    *    *    *

(B) The amount, if any, by which the amount of the equity capital (as defined in section 437 (c)) at the beginning of the taxpayer's first taxable year under this subchapter exceeds the amount of the equity capital at the beginning of the taxable year; * * *

[6] SEC. 437. INVESTED CAPITAL CREDIT.

(c) DEFINITION OF EQUITY CAPITAL.—The equity capital of the taxpayer as of any time shall be the total of its assets held at such time in good faith for the purposes of the business, reduced by the total of its liabilities at such time. * * *

no identifiable event or circumstance establishing the worthlessness of claims totaling about $97,000 as of December 29, 1950. There is nothing to indicate a material change of circumstance between the two dates. See *Sterling Morton*, 38 B. T. A. 1270, 1278 (1938), affd. 112 F. 2d 320 (C. A. 7) ; *875 Park Avenue Co.* v. *Commissioner*, 217 F. 2d 699, 701 (C. A. 2, 1954), affirming a Memorandum Opinion of this Court. There is little question that the debt was of doubtful value on December 29, 1950 (as it also probably was in any substantial sense on January 1, 1950), but the fact that the transferee in liquidation made no collections after that date is not controlling when there is no evidence of what, if any, efforts at collection were made, and if none were made, why.

Mention is made of the dissolution and liquidation of the company. These factors, however, do not of themselves, establish the worthlessness of its obligations. *Leicht* v. *Commissioner*, 137 F. 2d 433, 437 (C. A. 8, 1943), affirming 43 B. T. A. 1249. Reference was also made to the fact that the transferee did not assume the company's debt. It is obvious that assumption of the full debt would have been ridiculous. On the other hand, it is equally obvious that, had the transferee made any collections, it would have been obligated to pay over the proceeds to the creditor.

In any event, the parties do not stipulate nonworthlessness as of January 1, 1950, or worthlessness on December 29, 1950. If the debt was worthless on the latter date, there is no reason why petitioner should not have offered sufficient evidence to prove that fact since it was evident that respondent did not concede the correctness of the contention. The facts were obviously available to petitioner, and we are hardly in the position to assume that they would have sustained its position when they were not presented to us.

We, therefore, sustain respondent on this issue.

*Decision will be entered under Rule 50.*