William A. Sipprell and Jean B. Sipprell Van Auken (Formerly Husband and Wife) v. Commissioner.
Sipprell v. Commissioner
Docket No. 81896.
United States Tax Court
T.C. Memo 1962-92; 1962 Tax Ct. Memo LEXIS 218; 21 T.C.M. (CCH) 491; T.C.M. (RIA) 62092; April 23, 1962
Louis McClennen, Esq., for the petitioners. James Q. Smith, Esq., for the respondent. PIERCE Memorandum Findings of Fact and Opinion PIERCE, Judge: The respondent determined a deficiency in income tax against petitioners for the calendar year 1956 in the amount of $573.38; and the petitioners claim an overpayment of tax for said year of $10,901.61. The sole issue for decision is whether the capital stock of Arizona Distributors, an Arizona corporation, became wholly worthless in 1956 - so that a loss with respect to shares of such stock held by the principal petitioner is deductible in said year under section 165(g) of the 1954 Code. All other issues raised by the pleadings were conceded or abandoned by petitioners at the trial and on brief. Findings of Fact
*219 Some of the facts were stipulated. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by reference. The petitioners herein are William A. Sipprell (hereinafter sometimes referred to as "Sipprell") and his former wife, Jean B. Sipprell Van Auken. Said parties were divorced at an undisclosed date subsequent to December 31, 1956. They filed a timely joint Federal income tax return for the calendar year 1956 with the district director of internal revenue at Phoenix, Arizona. On March 4, 1955, Arizona Distributors (hereinafter referred to as the "Company") was incorporated by Sipprell and Edgar Marston, as an Arizona corporation, with principal office at Phoenix, Arizona. Its business, at all times here material, was that of selling at wholesale, several brands of home appliances, radios, and television sets. Sipprell served as the Company's president from the date of its incorporation until the summer of 1957, when he left the business and took no further active part therein. The Company originally had 10,000 shares of authorized capital stock of the par value of $100 per share - of which 1,000 shares were issued in 1955, with Sipprell purchasing *220 750 shares for $75,000, and Edgar Marston purchasing 250 shares for $25,000. In addition to said 1,000 shares, 111 shares of capital stock were issued to certain employees of the Company in January 1956, for $12,000, of which $11,100 was credited to capital stock and $900 was credited to paid-in surplus. Thereafter on July 20, 1956, the Company redeemed 14 shares of said stock from an employee for $1,500, charging $1,400 of said amount to capital stock and $100 to paid-in surplus. There were no other changes in the capital stock ownership until the summer of 1957. During 1956, Sipprell and other employees of the Company loaned it $86,250. These loans were evidenced by the Company's promissory notes, payable 10 years from their dates and bearing interest at the rate of 7 percent per annum. Interest was paid on said notes in 1956 (the taxable year here involved), but not thereafter. In March 1957, the Company's articles of incorporation were amended to authorize the issuance of 5,000 shares of nonvoting $100 par value 6 percent cumulative preferred stock. On March 31, 1957, the Company issued 832 1/2 shares of this preferred stock, and delivered said shares together with cash of *221 $3,000, to the holders of its above-mentioned 7 percent notes, in exchange for the surrender to it of said notes. The Company held a franchise for the distribution of Motorola products in the State of Arizona until December 1956, when it surrendered said Franchise. However, it had previously executed on November 20, 1956, an agreement with the Philco Corporation under which it became a franchised distributor in Arizona for Philco products, effective as of January 1, 1957. At no time prior to September 1957, did it have any franchises which were not terminable on short notice by either party. On February 19, 1957, the Valley National Bank, Phoenix, Arizona, renewed its line of credit with Arizona Distributors for an amount of $200,000. Of this amount, $150,000 was loaned on a pledge of the Company's accounts receivable, and $50,000 on a pledge of its inventory. The last advance made under this line of credit was on or about August 1, 1957. Sipprell and another stockholder personally guaranteed all loans to the Company made by the Valley National Bank. At all times here material, the Company conducted its business on leased premises. Its lease was executed in March 1955 for a period *222 of 10 years at an annual rental of $11,000. At the close of the calendar year 1956, the Company had paid all of its rent for said year, and also had prepaid some of its rent for the following period. The Company kept its books on an accrual basis, with its fiscal year ending June 30. During the period from its incorporation in March 1955, through June 30, 1955, it had an operating loss of $10,576.28. In the fiscal years 1956 and 1957, its net losses were $60,912.71 and $109,977.81, respectively. The parties have stipulated that the capital stock of the Company did have a value as of January 1, 1956; and its audited balance sheet as of June 30, 1956, disclosed a book net worth of $40,511.01. As of this date, the Company had only one class of authorized capital stock, of which as heretofore found, 1,111 shares were issued and outstanding. The net worth of the Company as of December 31, 1956, as disclosed by its unaudited balance sheet was $23,873.70; however, after correction is made to eliminate an item which admittedly was erroneously included, the adjusted unaudited book net worth as of December 31, 1956, was $22,783.08, as shown by the following summary balance sheet as of *223 said date; ASSETS
Current Assets
Cash
$ 15,282.47
Accounts receivable
$316,062.86
Less: Allowance for
doubtful acounts
10,361.40
305,701.46
Merchandise inventory
119,073.95
Total current assets
$440,057.88
Prepaid Expenses
Taxes
$ 148.50
Insurance and interest
3,424.25
Rent
2,170.95
5,743.70
Fixed Assets
Office furniture and fix-
tures
$ 10,907.36
Service and warehouse
equipment
3,366.66
Delivery equipment
12,955.49
Airplane
14,828.04
Sign
1,530.00
Leasehold improvements
8,913.03
$ 52,500.58
Less: Accumulated de-
preciation and amor-
tization
9,164.50
43,336.08
Other Assets
Deposits
$ 5,685.00
Organizational expenses
309.17
Miscellaneous
844.31
6,838.48
Total Assets
$495,976.14
LIABILITIES AND
NET WORTH
Current Liabilities
Accounts payable
$152,744.95
Notes payable - Valley
National Bank
215,843.07
Installment contracts pay-
able
11,924.97
Accrued taxes, interest
& Insurance
6,430.07
$386,943.06
Long-term Liabilities
Notes payable - 7% subordinated
promissory notes due in 1966
86,250.00
Shareholder's Equity
Capital stock - par value $100, authorized 10,000
shares, issued 1,111
shares less 14 shares
in treasury, outstand-
ing 1,097 shares
$109,700.00
Excess over par value re-
ceived on sales of com-
mon stock issued and
outstanding
800.00
$110,500.00
Deficit
87,716.92
Net Worth
22,783.08
Total Liabilities and Net Worth
$495,976.14
*224 As of December 31, 1956, there had been no declaration of insolvency of the Company; and no petition in bankruptcy, either voluntary or involuntary, had been filed. Also, no action had been taken by the Company's officers, board of directors or stockholders toward dissolving the Company, placing it in liquidation, or discontinuing its business operations. Furthermore, no action had been brought by any creditor to collect any debt of the Company. The audited balance sheet of the Company as of July 31, 1957, disclosed a book net worth of $9,990. As of this date, the issued and outstanding capital stock of the Company consisted of 832 1/2 shares of preferred stock and 1,097 shares of common stock. Since the preferred stock had a stated preferential dissolution value of $100 per share plus accumulated and unpaid dividends, said audited balance sheet would indicate that the common stock had no liquidating value at July 31, 1957. On July 31, 1957, the Company was indebted to Philco in the approximate amount of $104,000. Thereafter, pursuant to an agreement dated August 28, 1957, between the principal stockholders of the Company and the Philco Corporation, all of the Company's issued *225 and outstanding common and preferred stock was transferred to the Philco Corporation. And, under the terms of said agreement, Philco released said stockholders from any claims which it "may now or hereafter have" against them. In June 1958, the Company's articles of incorporation were amended to change the name of the corporation to Hawkins & Sweeney Co. In July 1958, the Philco Corporation effected a recapitalization of the Company, surrendering all of the stock acquired from Sipprell and the other former stockholders. In addition, Philco contributed $150,000 to the capital of the reorganized corporation, receiving therefor 150 shares of stock of the reorganized company, of the par value of $1,000 per share. The Company was still in existence, and operating under its changed name, at the time of the trial herein; and no receivership or bankruptcy proceedings had ever been brought against it. The petitioners, in their original return for the calendar year 1956 which is here involved, did not claim any loss on the ground that Sipprell's capital stock in Arizona Distributors had become worthless in that year; but in an amended return which they filed in December 1957, they claimed *226 a loss of $75,000 on the ground that said shares had become worthless in 1956. The respondent, in his notice of deficiency, disallowed such claimed loss and determined that the stock did not become worthless in said year. Ultimate Fact The capital stock of Arizona Distributors did not become worthless during the year 1956. Opinion The sole question for decision, as hereinbefore stated, is whether the capital stock of Arizona Distributors became wholly worthless during and within the year 1956. The petitioners contend that said question should be answered affirmatively; and accordingly, they claim the benefit of the provisions of section 165(g) of the 1954 Code. [1]
*227 Whether the stock of a particular corporation became worthless in a specific year is a question of fact, to be determined from consideration of all the evidence. The test is a practical, not a legal one. Lucas v. American Code Co., 280 U.S. 445 (1930); Boehm v. Commissioner, 326 U.S. 287 (1945); Joseph C. Lincoln, 24 T.C. 669 (1955), affd. on another point 242 F. 2d 748. The worthlessness of a stock is not to be deduced merely from a shrinkage in its value, no matter how extensive the shrinkage; for to sustain a deduction, the stock must actually have lost all its value. 875 Park Avenue Co. v. Commissioner, 217 F. 2d 699 (C.A. 2, 1954), affirming a Memorandum Opinion of this Court. Furthermore, where a taxpayer asserts that the stock of a particular corporation became worthless in a given year, he must establish not only that the stock had no current liquidating value at the close of that year, but also that it had no potential value. In Sterling Morton, 38 B.T.A. 1270 (1938), affd. 112 F. 2d 320 *228 (C.A. 7, 1940), we said at page 1278: The ultimate value of stock, and conversely its worthlessness, will depend not only on its current liquidating value, but also on what value it may acquire in the future through the foreseeable operations of the corporation. Both factors of value must be wiped out before we can definitely fix the loss. If the assets of the corporation exceed its liabilities, the stock has a liquidating value. If its assets are less than its liabilities but there is a reasonable hope and expectation that the assets will exceed the liabilities of the corporation in the future, its stock, while having no liquidating value, has a potential value and can not be said to be worthless. The loss of potential value, if it exists, can be established ordinarily with satisfaction only by some "identifiable event" in the corporation's life which puts an end to such hope and expectation. True it is that the Company here involved did incur a loss in each of its first three fiscal years, 1955 through 1957, which period covered the petitioners' taxable year here involved. However, of greater significance are the facts that the Company's management did not, at any time during *229 said period, take any steps to discontinue the business or to liquidate the corporation. Rather, they apparently had confidence in the Company's future prospects; for, on November 20, 1956, they entered into an agreement with the Philco Corporation to become its franchised distributor for the State of Arizona as of January 1, 1957. At the trial herein, the Company's sales manager testified as follows: Q. Were you happy or unhappy to get the Philco franchise in January of '57 then? A. It held hope of us succeeding, yes. Such acquisition of a new franchise which "held hope of us succeeding," is indicative that the Company's stock had potential value. The Company's sales manager further testified that as of December 31, 1956, not only were there good hopes for future profits, but that petitioner Sipprell, who was the Company's president, was "optimistic." And, although petitioner's counsel then argued that Sipprell was an "incorrigible optimist" (see use of such term in United States v. S. S. White Dental Mfg. Co., 274 U.S. 398), we find no warrant in the evidence for disregarding this optimism of the petitioner, so as to now find him to be an incorrigible pessimist. *230 Said sales manager also expressed an opinion during the course of his testimony, that if the Company had liquidated the assets shown on its balance sheet as of December 31, 1956, it would not have been able to realize the amounts of the book values there reflected. Such opinion, however, was couched in general terms; was in practically all cases, not expressed in specific dollar amounts; and was unsupported. We do not regard such opinion to be a reliable criterion of liquidating value. After considering and weighing all the evidence, and after noting the extent to which various assets had already been depreciated and amortized, we are convinced that the total liquidating value of all the assets as of said date, was more than the total liabilities on the same date. Moreover, we are further convinced from our consideration and weighing of all the evidence, that the capital stock of the Company did have potential value throughout the year 1956; and that, during said year, no identifiable event occurred to wipe out such value. We regard the following observation of Judge Learned Hand, speaking for the Court of Appeals for the Second Circuit in Bullard v. United States, 146 F. 2d 386, 388 *231 (C.A. 2, 1944), to be here apposite: The corporation did not go out of business, on the contrary it tried to go on, * * *. [Obviously] the corporation was not yet prepared to throw in the sponge. No liquidation was proposed; no declaration of insolvency made; no receiver appointed; no such "identifiable event" occurred as was necessary to establish the worthlessness of the property. * * * It would be unsafe to say that until a corporate business has been abandoned, there cannot be that "identifiable event" which is necessary in such situations; but at least we can say that, when the business does continue, the circumstances must be exceptional which will induce us to hold that the shares have as yet become worthless. We find no such exceptional circumstances in the instant case. The parties have stipulated that the stock did have value as of January 1, 1956; and the evidence herein negatives any conclusion that such value was wholly eliminated during the course of the year 1956. We hold, in accordance with our finding of ultimate fact, that the capital stock of Arizona Distributors *232 did not become worthless during and within the year 1956. We decide the issue for the respondent. Decision will be entered for the respondent. Footnotes
1. SEC. 165. LOSSES. * * *
(g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.↩