HENRY C. BECK COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1686–66.   Filed April 3, 1969.

*Sam G. Winstead* and *William D. Jordan,* for the petitioners.
*D. Ronald Morello* and *Ralph V. Bradbury, Jr.,* for the respondent.

4

The key question in this case is whether the $250,000 distribution to petitioner, which was made from Management's $1,065,313.09 profit on its Davenport venture, was made out of Management's "earning and profits."

Petitioner claims that the intercompany construction profit earned by Management became a part of its earnings and profits on receipt in 1954, and thus the distribution made out of such profit in 1955 was a dividend to petitioner. It is argued that this result is not altered by the fact that, in accordance with the consolidated return regulations, the profit was not "recognized" by Management as taxable income. Petitioner asserts that reasonable accounting concepts require that the profit be included in Management's earnings and profits when received in 1954, and there is no statute or regulation which requires or permits any other result.[1] To the contrary, respondent contends that the distribution cannot be a dividend because Management had no earnings and profits. In addition, he maintains that the distribution was from a collapsible corporation and is taxable as ordinary income. In his brief respondent relies on the following points in support of his position:

1. The filing of consolidated returns by Management and its subsidiaries represents a method of reporting income which must be followed in computing earnings and profits.

2. Since the intercompany profit of $1,065,313.09 was eliminated on the consolidated return, and, therefore, not recognized as taxable income, this "unrecognized" profit cannot be included in the earnings and profits of Management.

3. The earnings and profits of Management at the time of the distribution to petitioner were $1,911.41, and, therefore, it is only to this extent that the distribution could possibly be considered a dividend.

4. However, Management was "formed or availed of principally" to hold stock in Homes and Development, which corporations were formed or availed of principally for the manufacture, construction or production of property, or for the purchase of section 341 assets, "with a view to" a distribution to the stockholders, petitioner and Utah, before the corporations realized a substantial part of the income to be derived from the property.

5. Therefore, this distribution represents income from a collapsible corporation which, to the extent it exceeds petitioner's basis in the stock of Management, is taxable as ordinary income.

The term "dividend" means a distribution by a corporation to its shareholders made out of the corporation's "earnings and profits."[2]

---

[1] In its petition the petitioner has pleaded in the alternative that $249,500 of the distribution be taxed as long-term capital gain rather than ordinary income. The parties have agreed that if the Court finds against the petitioner in its contention that the distribution is a dividend and against respondent in his contention that the distribution is from a collapsible corporation, the petitioner will have dividend income of $1,911.41 and a long-term capital gain of $247,588.59.

[2] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

The statute, however, does not define "earnings and profits," but leaves the job of determining its meaning primarily to the courts and to the Commissioner of Internal Revenue. In common parlance the words usually connote some sort of realization. It also seems a reasonable inference that Congress was probably referring only to "realized" gain when it spoke of "earnings and profits," or at least this has been the almost unanimous assumption. See Albrecht, "Dividends and Earnings or Profits," 7 Tax L. Rev. 157, 182; cf. *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 506 (1948). This Court has said that earnings and profits "are computed by deducting from gross receipts the expense of producing them." *R. M. Weyerhaeuser*, 33 B.T.A. 594, 597 (1935). They are not synonymous with taxable income.[3] See Katcher, "What is Meant by Earnings and Profits," 18th Ann. N.Y.U. Tax Inst. 235, 236 (1960). Frequently, items of unallowable losses will decrease earnings and profits, or items of nontaxable income will increase earnings and profits. See 1 Mertens, Law of Federal Income Taxation, sec. 9.28 (1962). Many items are includable in earnings and profits which are not taxable income. And there are items deducted in computing taxable income which may not be deducted in computing earnings and profits. It is clear, therefore, that "earnings and profits" is much broader than "taxable income." It is an economic concept which the tax law has utilized "to approximate a corporation's power to make distributions which are more than just a return of investment." Albrecht, *supra* at 183. Plainly, the $1,065,313.09 profit made by Management, out of which was distributed the $250,000, was a sum which Management, upon receipt, could distribute to its shareholders without impairing its investment. Hence we think the instant case presents a classic example of earnings and profits distributed by a corporation as a dividend to its shareholders.

The fact that Homes and Development are subsidiaries of Management does not change this result. Parent and subsidiary corporations are not identical for tax purposes but are treated as separate entities no matter how closely they are affiliated. *National Carbide Corp.* v. *Commissioner*, 336 U.S. 422 (1949). The earnings and profits accounts of the members of an affiliated group are not consolidated, notwithstanding the consolidation of taxable income in consolidated return

---

[3] 175 T.M. "Earnings and Profits" A–2 (1967) states:

It is generally accepted today that the earnings and profits of a corporation consist of the total undistributed gains derived by the corporation with respect to the property contributed thereto by its shareholders since the time of such contribution. Such gains may arise not only upon the disposition of the contributed property but also as the result of corporate use of the property, *by way of* proceeds *from its disposition, and as the result* of the use of property acquired by the corporation with such proceeds. Earnings and profits are therefore to be distinguished from book income, taxable income, earned surplus, and similar concepts; what is involved in essence is the corporation's "tax-realized net gain with respect to contributed capital."

periods. *Freedman* v. *United States*, 266 F.2d 291 (C.A. 6, 1959); *Taylor-Wharton Iron & Steel Co.*, 5 T.C. 768 (1945).

The consolidated return regulations make it clear that intercompany profits and losses are eliminated in the computation of consolidated taxable income unless they are realized in a transaction with a party outside the affiliated group during the taxable year. See sec. 24.31 (b) (1), Regs. 129, and sec. 1.1502–31A (b) (1) (i), Income Tax Regs. However, in 1955, the consolidated return regulations contained no provision for the treatment of intercompany profits in the computation of earnings and profits of a separate member of the consolidated group.

The only published ruling on earnings and profits in an intercompany transaction prior to the 1965 proposed amendments to the consolidated return regulations is I.T. 3758, 1945 C.B. 159. This ruling supports the proposition that the distribution received by Management should be included in Management's earnings and profits account when received. The issue involved in the ruling was the ascertainment of the proper amount to be deducted from or added to the parent corporation's earnings and profits account when the parent corporation disposed of stock in an affiliated corporation. In accordance with the regulations, the parent's basis in the subsidiary's stock had been reduced by operating losses of the affiliate which had been availed of in consolidated returns. The Service ruled that the parent's earnings and profits account should not be reduced at the time of the subsidiary's losses availed of in the consolidated return; rather, at the time the parent sells the subsidiary's stock, the parent's unreduced basis should be utilized for earnings and profits purposes, and the reduced basis for taxable income purposes. The reasoning relied upon to reach this conclusion is important. First, it is pointed out that the computation of earnings and profits of a corporation for dividend purposes is based upon reasonable accounting concepts, and then it is stated on page 161 that—

In computing the earnings and profits of a parent corporation after a consolidated return period during which losses of a subsidiary were availed of as an offset to the income of such parent, the amount of the income of the parent corporation should be added to its earnings and profits account even though such amount was offset for tax purposes by losses of the subsidiary. * * *

In essence, the position adopted is that earnings and profits are to be increased by actual income, and not just by income which has been taxed. See also *Taylor-Wharton Iron & Steel Co.*, *supra* at 783.

Section 39.115(a)–2, Regs. 118, and section 1.312–6, Income Tax Regs., provide that "the amount of earnings and profits in any case will be dependent upon the method of accounting properly employed in computing net income." Consolidated returns are not a method of

accounting but only a method of reporting. *Henry C. Beck Builders, Inc.*, 41 T.C. 616 (1964). Thus the elimination of intercompany profit in a consolidated return is not determinative of the issue involved herein, and reasonable accounting concepts must be employed.

In *National Carbide Corp.* v. *Commissioner*, *supra* at 434–435, the Supreme Court said, "A corporation must derive its funds from three sources: capital contributions, loans, and profits from operations." The construction profit in the instant case obviously is not a capital contribution or a loan. Therefore, it must be a "profit from operations" of Management and thus part of its earnings and profits.

Respondent's position is that, because the profit is "eliminated" by the consolidated return regulations at the time received, the profit does not increase earnings and profits at that time. He argues that the word "eliminated" in what is now section 1.1502–31A(b)(1)(i), Income Tax Regs., is synonymous with the words "not recognized," citing *Oscar E. Baan*, 45 T.C. 71, 93 (1965), reversed and remanded in part on other issues, 382 F.2d 485 (C.A. 9, 1967), affd. 391 U.S. 83 (1968), and *Bangor & Aroostook Railroad Co.*, 16 T.C. 578 (1951), affd. 193 F.2d 827 (C.A. 1, 1951), certiorari denied 343 U.S. 934 (1952).

In the *Baan* case this Court carefully pointed out that "the terms 'elimination' and 'nonrecognition' are intended to be synonymous *in this context*." (Emphasis added.) We were there dealing specifically with a *limited* situation involving the applicability of section 355, a nonrecognition provision relating to an item of taxable income, and not to an "earnings and profits" question where the gain will never be "recognized" for Federal income tax purposes.

The *Bangor & Aroostook* case presented a situation in which, where the recognition of gain was postponed, the earnings and profits were affected not at the time of the original unrecognized transaction but at the time that the gains or losses were actually taken into account in computing taxable income. In that case the taxpayer in 1942 had repurchased its own bonds on the open market, paying less for them than their face value and realizing a profit on the difference. Pursuant to the option provided under 1939 Code sections 22(b)(9) and 113(b)(3), the taxpayer excluded the profit from its 1942 income and applied the profit instead in reduction of the basis of property held by the taxpayer. Later, in calculating its excess profits tax for 1943, the taxpayer used the invested capital method for computing its excess profits credit. Part of that credit is "accumulated earnings and profits." The taxpayer included its 1942 bond profit in "accumulated earnings and profits," and the Commissioner excluded it. This Court applied section 115(1) of the 1939 Code to section 718(a)(4) (relating to excess profits tax), insofar as it affected the meaning of earnings, because the concept of earnings for the income tax was generally applicable to the

excess profits tax. We held that the earnings and profits were not affected in 1942 and would not be affected until the taxpayer depreciated or disposed of property to which the reduction in basis applied. In so holding, we said (16 T.C. at 585–586) :

Unlike other exclusions from income provided for by section 22(b), the profit from discharge of indebtedness is excluded only on the condition that it be applied in reduction of the basis of property held by the petitioner. * * * In reality, by providing for an adjustment altering the basis of property which petitioner would otherwise be entitled to use, Congress did not relieve the profit of tax but only postponed the time for levying the tax. Instead of collecting a tax on the profit when received, Congress merely deferred recognition of the profit and collection of the tax until the time at which the property with the reduced basis was sold or otherwise disposed of. * * *

This method of treating the profit is comparable to the treatment accorded nontaxable exchanges governed by the so-called reorganization provisions in section 112 of the Code, where recognition is similarly postponed. In both situations, the earnings and profits are affected, not at the time of the original unrecognized transaction, but at the time that the gains or losses are actually taken into account in computing taxable income. True, the result with respect to section 112 transactions, dealing with sales and exchanges, is specifically called for by section 115(1),[7] but, as we have seen, section 115(1) was merely declaratory of existing law in this regard, and the same result is required by a proper interpretation of the term "earnings and profits."

Moreover, petitioner's position is open to the objection that it might actually require the same gains to be included twice in its earnings and profits. * * * As to the property affected by petitioner's election in the instant case, the adjusted basis for determining gain is the basis as adjusted downward under section 113(b)(3). When petitioner disposes of that property, the adjusted basis will increase the taxable gain or decrease the deductible loss. Since use of the same basis seems to be required under section 115(1), a comparable increase in earnings and profits apparently will take place at the time of disposition of the property. If this consequence follows from the adjustment in basis under section 113(b)(3), there would be a duplication in the increase in petitioner's earnings and profits were they also to be increased, as petitioner contends they should be, upon the realization of the bond profit responsible for the basis adjustment. A construction which involves such an irrational result is to be avoided in the presence of an acceptable alternative. Cf. *Taylor-Wharton Iron & Steel Co.*, 5 T.C. 768, 781–783.

[Footnote omitted.]

The *Bangor & Aroostook* case holds that when taxation of the gain is deferred, conditioned upon a reduction of basis, the inclusion in earnings and profits occurs when the gain is taken into account in computing taxable income; otherwise there might be a duplication in the earnings and profits account. Moreover, as observed in the opinion of the Court of Appeals (193 F.2d at 831) :

The taxpayer having technically realized its so-called bond profit in 1942, elected under an optional method of accounting permitted by the statute to postpone recognition of such gain and and to exclude the amount thereof from its gross income reported for 1942. It cannot then shift its method of accounting, and treat that gain as both realized and recognized in 1942, for the purpose of

enhancing a deduction (the excess profits credit) used in the computation of its excess profits tax liability for 1943.

This case, unlike *Bangor & Aroostook*, is not one of deferral taxation of a gain or profit; the gain will never be taxed to Management (the penalty being that Homes and Develepment must exclude the profit from their basis in their houses, from which the profit was derived). Under Rev. Rul. 60–245, 1960–2 C.B. 267, the profit herein, received in 1954, would have been taxed to Management in 1957, when Management sold the stock of Development and Homes. However, Rev. Rul. 60–245 has been rejected by the courts. See *Henry C. Beck Builders, Inc., supra; Commissioner* v. *United Contractors, Inc.*, 344 F.2d 123 (C.A. 4, 1965), affirming a Memorandum Opinion of this Court. The Internal Revenue Service has announced that it will follow these decisions as to years prior to 1965. T.I.R. 764, Sept. 28, 1965.

Unlike *Bangor & Aroostook*, this case does not involve a reduction in Management's basis, requiring the same gains to be included twice in Management's earnings and profits. And, unlike *Bangor & Aroostook*, this is not a case in which the taxpayer postponed recognition of the gain in a taxable year and then shifted its method of accounting to recognize the same gain in the same year to increase a deduction. In short this case contains none of the unusual factors which, in *Bangor & Aroostook*, militated against inclusion of the gain in earnings and profits when received. This is simply a case in which, under Federal tax law, including respondent's regulations, Management is not taxed on a realized profit.

This single fact, that the profit will not be taxable to Management, does not make it any less a profit, and is no reason for concluding that it did not become a part of Management's "earnings and profits" when received. As we have previously stated herein, earnings and profits are not synonymous with or restricted to taxable income; rather, they are those funds which a corporation has available for distribution to its shareholders without invading their investment. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 160 (2d ed. 1966). In 1954, Management, on its Davenport venture, received $5,323,422.31 over expenses of $4,258,109.22—an excess of receipts over cost in the amount of $1,065,313.09. As of the time of such receipt in 1954, this $1,065,313.09 was available for distribution to Management's shareholders without impairing their investment. It was clearly a profit made in 1954. Reasonable accounting principles, as well as accuracy, require that it be included in Management's "earnings and profits" as of 1954.

This is also made clear by the First Circuit opinion in *Bangor & Aroostook Railroad Co.* v. *Commissioner, supra*. The court there

held that "income which, though 'realized,' is not at the outset 'recognized,' " will not be included in earnings and profits until it is recognized. 193 F.2d at 829. But the court distinguished deferred income from "exempt" income, such as income from tax-free bonds, which, like the profit in this case , will never be recognized by the corporation at all. The court said that "if income of this sort is to be taken into 'earnings or profits,' the only logical time to do so is when the income is realized." 193 F.2d at 829. We think the same rule should apply in this case.

The concurring opinion in *Henry C. Beck Builders, Inc., supra,* indicates the same result. Speaking of the profit obtained in that case by Salina Management Co., which gain was eliminated from taxable income in the year of receipt, and will never be taxed to Salina Management Co., such opinion said (41 T.C. at 635) : "Furthermore, the profit actually realized by Management on the construction of the project presumably would be taxed to its stockholders upon distribution thereof to them." The phrase "profit actually realized" means that the profit would be included in "earnings and profits" at the time of receipt, because, under this Court's decision, the time of receipt was the only time Salina Management "realized" any profit on the construction project.

In its treatment of the profit in this case—eliminating it from the consolidated return and crediting it to earnings and profits when received—Management has followed all applicable regulations, but, as of the time here in issue, there were no regulations which required or permitted the profit to be taken into earnings and profits at any time except when it was received. In these circumstances reasonable accounting principles should control, and these require that the profit be credited to earnings and profits when received. See *Henry C. Beck Builders, Inc., supra* at 620–623, 625, 627, 633.

In 1965 the regulations were amended. If these amended regulations were applicable to this case, the profit apparently would not be credited to earnings and profits until 1957, when Management sold its stock in Homes and Development to an outside party.[4] But, by

---

[4] Under the amended consolidated return regulations, effective for years after 1965, the distribution from Development and Homes to Management would be treated as follows : The performance of construction services by Management for Homes and Development is defined as a deferred intercompany transaction. Sec. 1.1502–13(a)(2)(ii). Profit on a deferred intercompany transaction is deferred by the selling member of the group and not reported at the time of the transaction. Sec. 1.1502–13(c). If the purchasing member sells the asset to a nonmember, the original selling member reports its deferred profit at that time. Sec. 1.1502–13(f)(1)(i). The profit is included in the purchasing member's basis. Sec. 1.1502–31(a). If the purchasing member uses the asset in its business, the selling member takes into account its deferred profit at the same rate at which the purchasing member depreciates the asset. Sec. 1.1502–13(d). The earnings and profits account is not increased at the time of the deferred intercompany profit, but rather the profit is reflected in the earnings and profits of the selling member for the taxable year in which such deferred profit is reported. Sec. 1.1502–33(a).

12

their express terms, these amended regulations do not apply to years prior to 1965.

Respondent relies upon section 39.115(a)–2(a), Regs. 118,[5] which provides:

In determining the amount of earnings or profits (whether of the taxable year, or accumulated since February 28, 1913, or accumulated before March 1, 1913) due consideration must be given to the facts, and, while mere book-keeping entries increasing or decreasing surplus will not be conclusive, the amount of the earnings or profits in any case will be dependent upon the method of accounting properly employed in computing net income. For instance, a corporation keeping its books and filing its income tax returns under sections 41, 42, and 43 on the cash receipts and disbursements basis may not use the accrual basis in determining earnings and profits; a corporation computing income on the installment basis as provided in section 44 shall, with respect to the installment transactions, compute earnings and profits on such basis; * * *

The part of this regulation relating to installment sales was upheld and applied in *Commissioner* v. *South Texas Lumber Co.*, *supra*, an excess profits tax case, in which it was decided that a corporate taxpayer reporting income from installment sales on the installment basis also had to report the gain in earnings and profits on the installment basis. The Supreme Court said that the regulation was "in harmony with the long-established congressional policy that a taxpayer generally cannot compute income taxes by reporting annual income on a cash basis and deductions on an accrual basis." 333 U.S. at 501. The thrust of the regulation is that a taxpayer cannot, with respect to the same transaction, compute taxable income on one basis of accounting and compute earnings and profits on another basis of accounting. We believe this regulation supports petitioner's position herein. Management did not use one method of accounting in computing its tax and another method in computing its earnings and profits. The consolidated return of Management, Homes, Development, and Service for the fiscal year ended February 28, 1954, was filed on the accrual basis of accounting. The intercompany profit accrued in the fiscal year ended February 28, 1954, and, therefore, under the accrual basis of accounting, such intercompany profit was included in earnings and profits of Management for such fiscal year. The reason the profit was eliminated from taxable income in the consolidated return was because of the requirement of respondent's own regulations, and not because of any inconsistency in Management's accounting. Further, in accordance with the regulations, such profit was excluded from the basis of Homes and Development in their housing units. As previously pointed out, it is well settled by decisions of this Court that a consolidated return is merely a method of reporting taxes, not a method of accounting. Thus, in strict accord

[5] Sec. 1.312–6(a), Income Tax Regs., is substantially the same.

with section 39.115(a)–2(a), Regs. 118, relied upon by respondent, "the amount of earnings and profits" of Management from the construction contracts has been determined "upon the method of accounting properly employed in computing net income." Indeed, respondent does not ever assert that Management changed its method of accounting in determining its earnings and profits.

Section 312(f)(1) of the 1954 Code and its predecessor, section 115(l) of the 1939 Code, do not, as the respondent contends, support the proposition that the profit made by Management cannot be included in earnings and profits when received. These sections, by their terms, apply to the "sale or other disposition of property." In *Bangor & Aroostook Railroad Co., supra,* the rule of these sections was extended to the "analogous" situation of deferred recognition of gain from a profit on cancellation of indebtedness. Also, under the regulations, gains or losses "within the purview of section 112 or corresponding provisions of prior Revenue Acts are brought into the earnings and profits at the time and to the extent such gains and losses are recognized under that section." Sec. 39.115(a)–2(b), Regs. 118. Thus, the *Bangor & Aroostook* case and respondent's regulations would seem to hold that the rules of section 312(f)(1) and section 115(l) apply to (1) gains or losses which are from a "sale or other disposition * * * of property" and (2) gains or losses the recognition of which is deferred until the happening of some later event. The intercompany profit involved herein is not in either of these categories. It is not a gain from a sale or any kind of disposition of property; it is income paid to Management under a construction contract. It is not income the recognition of which will be deferred; it is income which Management will never recognize. It is therefore abundantly plain that the intercompany profit from the construction fee is in no way affected by section 312(f)(1) or 115(l).

This result is also compelled by legislative history. In 1940 when Congress amended section 115(l) to provide that gain or loss from sale or other disposition of corporate property would be included in earnings and profits only to the extent recognized, the committee report specified that such amendment "does not purport to prescribe rules for anything other than certain exceptional cases, namely, the nonrecognition provisions of section 112, use of value as of March 1, 1913, as the basis for determining gain or loss, and depreciation and depletion, and tax-free distributions which either are applied in reduction of the basis or cause the basis to be allocated." H. Rept. No. 2894, 76th Cong., 3d Sess., p. 43 (1940). Congress, however, did not see fit to include intercompany profits within the "certain exceptional cases" covered by the amendment to section 115(l).

The *Bangor & Aroostook* case makes a clear distinction between (1) gains the recognition of which is postponed, which gains will be carried into earnings and profits when recognized, and (2) income which is exempt from taxation, which will be carried into earnings and profits when received. This same distinction appears in the regulations, which, while requiring that deferred recognition gains be included in earnings and profits when recognized, also specifically state that earnings and profits must include exempt income. Sec. 39.115(a)–2(b), Regs. 118. The eliminated intercompany profit is tax-exempt income by virtue of the consolidated return regulations. Exempt municipal bond interest is tax-exempt income by virtue of a statute. Sec. 103, 1954 Code. The analogy is compelling. The "only logical time" to take such income into earnings and profits is "when the income is realized." *Bangor & Aroostook R. Co.* v. *Commissioner, supra* at 829. These same principles are followed and approved in *Alabama By-Products Corp.* v. *United States*, 137 F Supp. 252 (N.D. Ala. 1955), affirmed per curiam 228 F. 2d 958 (C.A. 5, 1956).

Respondent also refers to section 1.312–11, Income Tax Regs.,[6] "or an analogy thereto," in contending that a proper "adjustment" and allocation of earnings and profits should be made between Homes and Development, and Management. In applying what he calls an "earnings and profits adjustment" theory respondent states that—

In terms of the instant *sale* by Management to Homes and Development, the proper adjustment is to treat the excess of the basis received over the basis transferred as an allocation of Homes and Development's earnings and profits (to the extent thereof) to Management so that when Homes and Development are without earnings and profits (as is the case here), there is nothing to adjust or allocate. The result in the instant case is that Management's earnings and profits are not increased on this intercompany *sale* at a profit. [Emphasis added.]

Section 1.312–11(a) deals with sales or other dispositions. It does not state what adjustment or allocation of earnings and profits should be made, if any, in the case of a construction fee, such as we have here. It appears that respondent's "adjustment theory" stems from his erroneous impression that the profit in this case consists of the gain from a sale. There was no "sale"; the intercompany profit was not a gain or loss from the "sale or other disposition of property" but an item of income earned by Management as a fee for the performance of a construction contract. Consequently, we believe respondent's theory is inapplicable under these circumstances.

---

[6] Sec. 1.312–11 Effect on earnings and profits of certain other tax-free exchanges tax-free distributions, and tax-free transfers from one corporation to another.

(a) If property is transferred by one corporation to another, and, under the law applicable to the year in which the transfer was made, no gain or loss was recognized (or was recognized only to the extent of the property received other than that permitted by such law to be received without the recognition of gain), then proper adjustment and allocation of the earnings and profits of the transferor shall be made as between the transferor and the transferee. * * *

To summarize, the profit involved herein was received, and became available for use by Management, in 1954, and realistically it should be included in Management's earnings and profits at such time. There is no statute, regulation, or other authority which requires that such inclusion be deferred. Contrary to respondent's contention, such inclusion cannot be deferred until 1957, when Management sold the stock of its subsidiaries, because, under the pre-1965 regulations, the gain is not to be recognized at such time, and will never be recognized by Management. *Henry C. Beck Builders, Inc., supra.* Thus, there are only two possibilities: either (1) the $1,065,313.09 profit will be included as earnings and profits at the time of receipt or (2) it will never be included in earnings and profits. The second possibility is, to use the words of this Court, "an irrational result" which is "to be avoided in the presence of an acceptable alternative." *Bangor & Aroostook Railroad Co., supra* at 586. The first possibility is not only an "acceptable alternative," but reflects the actual fact that the profit was realized by and available to Management in 1954. Cf. *Cummings v. Commissioner,* 73 F. 2d 477, 480 (C.A. 1, 1934).

Accordingly, we hold that the profit received by Management in 1954 should be included in its earnings and profits in that year, and Management's distribution to petitioner in 1955 was a distribution "made out of earnings and profits" within the provisions of section 316(a) and an ordinary dividend under section 301.[7] It therefore follows that the petitioner properly treated this as a dividend, deducting 85 percent of the distribution in accordance with section 243[8] and reporting the remaining 15 percent as a taxable dividend.

We do not reach the second question, i.e., whether Management was a collapsible corporation under section 341(a)(3), because that section applies only if the distribution is "a distribution made by a collapsible corporation which, under section 301(c)(3)(A), is

---

[7] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

\* \* \* \* \* \* \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

(2) AMOUNT APPLIED AGAINST BASIS.—That portion of the distribution which is not a dividend shall be applied against and reduce the adjusted basis of the stock.

(3) AMOUNT IN EXCESS OF BASIS.—

(A) In general.—Except as provided in subparagraph (B), that portion of the distribution which is not a dividend, to the extent that it exceeds the adjusted basis of the stock, shall be treated as gain from the sale or exchange of property.

[8] SEC. 243. DIVIDENDS RECEIVED BY CORPORATIONS.

(a) GENERAL RULE.—In the case of a corporation, there shall be allowed as a deduction an amount equal to the following percentages of the amount received as dividends from a domestic corporation which is subject to taxation under this chapter:

(1) 85 percent, in the case of dividends other than dividends described in paragraph (2) or (3);

treated, to the extent it exceeds the basis of the stock, in the same manner as a gain from the sale or exchange of property." Since the type of distribution which is so treated under section 301(c)(3)(A) is a "distribution which is not a dividend," it follows that a distribution which is a dividend is not affected by section 341. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders 419–420. In view of our conclusions on the first issue, we have made no findings of fact with respect to the second issue.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

TANNENWALD, *J.*, dissenting: The majority decision herein is founded upon two principles: (1) that "earnings and profits" are not coextensive with "taxable income" and (2) that the earnings and profits of members of an affiliated group are not consolidated, notwithstanding the consolidation of taxable income during consolidated return periods. I have no quarrel with these principles, which have generally been accepted by the courts. But they are not, in my opinion, determinative and must be applied within the context of an equally accepted principle recognized by the majority, namely, that an item of income, the taxability of which is deferred until a later year, does not enter into earnings and profits at the time of receipt. *Commissioner v. South Texas Co.*, 333 U.S. 496 (1948); *Bangor & Aroostook Railroad Co.*, 16 T.C. 578 (1951), affd. 193 F. 2d 827 (C.A. 1, 1951); see *Sid Luckman*, 50 T.C. 619 (1968), on appeal (C.A. 7, Jan. 8, 1969). It is in the application of this principle that I believe the majority has erred.

Concededly, the $1,065,313.09 profit made by Management was not simply deferred as to Management. Under the rules in existence during the period in question, that profit would never be taxed to Management (respondent's current regulations, as the majority points out, provide otherwise). But, since this intercompany profit was eliminated from the consolidated return, Homes and Development were required to exclude the amount of that profit from the cost basis of the property to them. Sec. 1.1501–31A(b)(1) and sec. 1.1501–38A(b), Income Tax Regs.; see *Kentucky Farm & Cattle Co.*, 30 T.C. 1355, 1367 (1958); Rev. Rul. 60–289, 1960–2 C.B. 268. Consequently, that profit represented potential income to Homes and Development at such time as the property was disposed of.[1] Thus, although the amount in question

---

[1] Under the current regulations, a portion of that profit, when and if realized, would be allocated to Management, but those regulations are not applicable to the years involved herein. See fn. 4 to the majority opinion, *supra* at p. 11. Note also that any balance of the deferred profit would have to be taken into income of Management at the time Management (or Homes or Development) ceased to be a member of the group. Sec. 1.1502–13(f)(1)(iii), Income Tax Regs.

may have been permanently excluded from Management's income, it was only deferred when the tax position of the consolidated group is viewed in its entirety.[2]

If the majority herein is correct, the same amount of profit will be subject to a double inclusion in earnings and profits—in that of Management at the time of receipt of the payment and that of Homes and Development when the property is sold. This double counting is precisely what concerned this Court and the Court of Appeals in *Bangor & Aroostook Railroad Co.*, 16 T.C. at 586 and 193 F. 2d at 833, and it was an underlying consideration in *Henry C. Beck Builders, Inc.*, 41 T.C. 616 (1964). See concurring opinion of Drennen, *J.*, 41 T.C. at 634. Cf. also *Oscar E. Baan*, 45 T.C. 71, 93 (1965), reversed and remanded 382 F. 2d 485 (C.A. 9, 1967), reversed and affirmed 382 F. 2d 499 (C.A. 9, 1967), affirmed, reversed, and remanded sub nom. *Commissioner* v. *Gordon*, 391 U.S. 83 (1968). I am not aware of any provision of law or any decided case which would permit Homes and Development to receive credit, in the computation of their earnings and profits, for the amount which the majority has decided should be included in the earnings and profits of Management.

To be sure, the double inclusion could be avoided by a sale of the stock of Homes and Development and a liquidation, with an accompanying step-up in basis under section 334(b)(2), but that would be the result of the independent action of that section and should not affect our analysis of the issue involved herein. See *Henry C. Beck Builders, Inc.*, 41 T.C. at 628.

I think it is also significant that, under the current regulations, the profit would not be included in earnings and profits until such time as the deferred amount is taken into income. Sec. 1.1502–33(a), Income Tax Regs.; see fn. 1, *supra*. Granted that these regulations are not made retroactive, it does not follow that, at least with respect to the problem of *timing*, they cannot be used as a guide to the principle to be applied in the judicial filling of a void in respondent's prior regulations.[3]

I would hold that the $1,065,313.09 did not enter into the earnings and profits of Management for 1954 and consequently its distribution in 1955 did not constitute a dividend to Management's shareholders.

Since the majority found it unnecessary to reach the collapsible issue and made no findings of fact with respect thereto, I am unable to express any opinion as to the considerations involved therein.

RAUM, *J.*, agrees with this dissent.

---

[2] Salem, "The Consolidated Return Regulations Revision: Its Genesis and Objectives," 17 Tax Exec. No. 2 (Jan. 1965), pp. 166–168.

[3] Under the current regulations, the deferred amount would enter into the earnings and profits of Management (rather than Homes or Development) at the later date. See fn. 1, *supra*.