M B & B, INC., A WASHINGTON CORPORATION, MICHAEL J. DONAHUE AND BARBARA R. DONAHUE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
M B & B, Inc. v. Commissioner
Docket No. 17986-96S.
United States Tax Court
1998 U.S. Tax Ct. LEXIS 62; May 28, 1998, Filed *62 Decision will be entered under Rule 155. Suzanne Waltraud Danielle, for petitioners.
Julie L. Payne, for respondent. DEAN, Special Trial Judge. DEAN
DEAN, Special Trial Judge: This case was heard pursuant to the provisions of section 7463. [1] The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.
Respondent determined a deficiency in M B & B, Inc.'s (Northshore Exxon) [2] Federal income taxes for fiscal years ending September 30, 1990 and 1991 in the amounts of $ 3,489 and $ 2,273, respectively. Respondent determined a deficiency in Michael and Barbara Donahue's (the Donahues) Federal income taxes for 1990 and 1991 in the amounts of $ 1,584 and $ 7,602, respectively.
*63 After concessions by the parties, [3] the primary issues for decision are: (1) Whether payments made by Northshore Exxon to the Donahues are repayment of loans, compensation for services, or constructive dividends; (2) whether leases of business equipment by the Donahues to Northshore Exxon constitute capital or operating leases; and (3) whether the corporation had sufficient earnings and profits out of which to make dividend distributions to the Donahues.
*64 Some of the facts have been stipulated. The stipulation of facts and accompanying documents are incorporated herein by reference. Northshore Exxon is a Washington corporation with its principal place of business in Federal Way, Washington, during the years in issue and when it filed its petition. The Donahues resided in Auburn, Washington, at the time their petition was filed.
Background
The Donahues operated Northshore Exxon, a gasoline service station, as a sole proprietorship until October 1988. Michael Donahue then incorporated Northshore Exxon and operated it as a C corporation through September 30, 1991. The corporation filed a Form 1120 U.S. Corporation Income Tax Return for its fiscal years ending September 30, 1990 and 1991. After electing subchapter S corporation status, Northshore Exxon filed a Form 1120S U.S. Income Tax Return for an S Corporation, for the "short period" of October through December of 1991. The Donahues were the sole shareholders of Northshore Exxon and served as corporate officers and directors for the years in issue.
When the Donahues incorporated Northshore Exxon, they deposited $ 1,000 into the corporation's checking account as an initial capital *65 contribution. The corporation's accountant at the time, Nancy Bjorkman, [4] allocated the $ 1,000 as basis for the 500 shares of stock received by the Donahues.
Loans to the Corporation
The Donahues transferred $ 36,005 worth of inventory, and $ 5,235 worth of operating capital consisting of cash and accounts receivable from the sole proprietorship to the newly formed corporation.
The Donahues characterized the transfer of inventory and capital as a loan to the company in the amount of the value of the transferred property. They set up a Stockholder Loan Payable Account which totaled $ 41,240 as of January 1, 1989. Corporate records and tax returns indicate that Northshore Exxon paid the balance down to $ 28,948 by September 30, 1989. From October 1, 1989 through September 31, 1990, the debt was reduced to $ 24,179, and by September 31, 1991, it was reduced to $ 6,804. During the short period year as an S corporation, the debt rose to $ 7,590. No notes *66 were issued to document the loans made by the Donahues, and Ms. Bjorkman testified that no stock was issued in connection with the transfer of inventory and capital.
Having the corporation incur debt to acquire the inventory and operating capital was part of the Donahues' financial plan for Northshore Exxon. The December 15, 1988, corporate minutes reflect that the corporation passed a resolution authorizing Northshore Exxon to borrow up to $ 75,000 from petitioner Michael Donahue. At the annual meeting held on June 1, 1989, Mr. Donahue agreed to offer the corporation a $ 75,000 open line of credit. The minutes from that meeting state that "an open account of loans from stocholder [sic] will be maintained on the corporate books and Mr. Donahue will be allowed payments from time to time. 9% interest will be charged for the use of this money for amounts over $ 10,000 borrowed for over 6 months." The Donahues reported interest income payable from Northshore Exxon on their 1990 and 1991 Federal income tax returns in the amounts of $ 5,124 and $ 667, respectively.
On January 1, 1990, the Donahues signed employment contracts with Northshore Exxon. Michael Donahue was to receive $ 32,500 *67 for his services as the chief executive officer and president, and Barbara Donahue was to serve as the station manager and was to provide accounting services for a salary of $ 20,500. As of January 1, 1991, these contracted salaries continued, but at the reduced rates of $ 30,000 and $ 18,000, respectively.
In April 1991, the Donahues believed that their business was suffering financially due to negative publicity over the Exxon Valdez oil spill. The financial statement prepared as of March 31, 1991, showed net losses to the corporation in excess of $ 12,000. After consulting with their accountant, the Donahues decided to forgo their salaries instead of allowing the business to incur more debt to meet their salary obligations. When asked why it was necessary to forgo his wages, Mr. Donahue testified that "we had some pretty substantial losses to the corporation, and I was trying to turn that around. And [the accountant] pointed out that we had a lot of loans on the books, and it would not look good for, you know, banking purposes, if we needed to borrow money. And then the obvious, of instead of being $ 12,000 for a loss, we'd be at $ 24,000 if we continued to take our wages *68 as we were."
So the Donahues forwent their wages, but continued to perform services for Northshore Exxon. Mr. Donahue's services remained virtually unchanged, but in August of 1990, Mrs. Donahue opened a new service station, Fife Exxon, as a sole proprietorship. From that point forward, Mrs. Donahue spent considerably less time at Northshore Exxon, helping out when needed but otherwise spending most of her time at Fife Exxon.
Position of the Parties
The Donahues contend that Northshore Exxon made increased repayments of their loan as part of an overall financial plan to reduce the shareholder debt. Respondent, on the other hand, determined that $ 29,576 in payments from Northshore Exxon to the Donahues are not loan payments, but are disguised payments for services and should be taxed to the Donahues as wages. In the alternative, respondent argues that the payments constitute constructive dividends. The inventory, cash, and accounts payable, respondent argues, were really capital contributions to the service station, and any payments made by the corporation to the Donahues are return on capital, not debt repayment.
Equipment Leases
As the Donahues transferred the inventory *69 to the newly formed corporation, they also made plans to provide service station equipment to the corporation. On December 15, 1988, the Donahues entered into an equipment lease with Northshore Exxon for all the necessary operating equipment for the service station, including equipment to perform vehicle repair. Included in the lease was the use of a 1987 Chevrolet Blazer. The lease provided for 12 monthly payments of $ 2,500, and was to run from January 1 through December 31, 1989. A similar lease was entered into for 1990, but included a tow truck with special towing gear. The monthly lease payments for 1990 were raised to $ 2,819 per month to cover the additional cost of the tow truck. In 1991, the lease was renewed and included all the previous equipment, plus a mobile office unit. The monthly payments were decreased to $ 2,150, which took into account the declining value of the equipment and the corporation's ability to make payments under the lease.
The terms of the lease for 1989, 1990, and 1991 are substantially the same. The lease provisions provide that Northshore Exxon assumed the risk of loss and damage to the equipment and was responsible for maintaining the equipment *70 in good repair and operating condition. The Donahues remained the owners of the property under the leases, but Northshore Exxon paid all taxes and assumed any liability for personal injuries caused in the operation of the equipment. The corporation was to maintain a liability insurance policy of at least $ 250,000.
Although not manifest in the terms of the lease, at various times throughout 1989, 1990, and 1991, Mr. Donahue expressed his intent to transfer the equipment to Northshore Exxon upon completion of 3 years under the leasing agreement. The corporate minutes from June 1, 1989, reflect:
4. Report by Michael J Donahue. Michael J Donahue reported that Mr. Donahue has been investigating the possible purchase of a tow truck for use by the corporation. As the corporation can not provide capital or credit to allow it to purchase on it's [sic] own behalf Mr. Donahue has agreeded [sic] to fund the purchase and lease the equip. back to the corporation on a short term lease. Mr. Donahue would be willing to transfer all equip. to the corporation after 3 Yrs.
Subsequent corporate minutes from June 1, 1990, and August 15, 1991, indicate that Mr. Donahue's plan was to transfer *71 title of the tow truck and other equipment to the corporation at their depreciated value. Mr. Donahue testified that the intended transfer was to avoid the "hassle" of the payments and to make life easier for him and his wife. The corporate minutes from June 30, 1992, reflect that the equipment was indeed transferred to the corporation as planned and was retroactively effective on January 1, 1992.
Position of the Parties
Respondent determined that Northshore Exxon's payments on the equipment lease are not properly deductible by the corporation as lease expenses, but rather are capital payments on the sale of the assets. The agreement for the use of the equipment is a capital lease, as opposed to an operating lease, and respondent contends that it should be treated as recovery of basis, gain on sale, interest income, and dividends to the Donahues.
The Donahues maintain that the lease is not a capital lease because it never gave the corporation any equity rights in the equipment prior to the final transfer, which happened after the lease expired. They further argue that because the lease did not contain any terms of sale, such as the price at which the assets would be sold, or *72 any other relevant information, it should not be reclassified as a capital lease.
DiscussionLoan Repayments Versus Salary or Dividends
We shall first determine the character of the transfers made by Northshore Exxon to the Donahues. The Donahues transferred approximately $ 40,000 in inventory and operating capital to the corporation and contend that they made a loan to the corporation in the amount of the value of the transferred property.
For Federal income tax purposes, a transaction will be characterized as a loan if there was "an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment". Haag v. Commissioner, 88 T.C. 604, 616 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988). What is important is the bona fide intent that the debt shall be repaid, rather than the name of the transaction or the form the transaction takes. Berthold v. Commissioner, 404 F.2d 119, 122 (6th Cir. 1968), affg. T.C. Memo 1967-102; Patrick v. Commissioner, T.C. Memo 1998-30.
The Donahues testified *73 that they intended the payments they received from the corporation to be loan repayments. The mere declaration of intent, however, is not determinative without further evidence substantiating the existence of bona fide debt. Cordes v. Commissioner, T.C. Memo 1994-377. But a bona fide transaction is not invalidated by the mere fact that the arrangement of the transaction confers tax benefits upon the taxpayer. Gyro Engg. Corp. v. United States, 417 F.2d 437, 440 (9th Cir. 1969).
The Court of Appeals for the Ninth Circuit has identified 11 objective factors to consider in determining whether bona fide debt exists: (1) The names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (8) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; and (11) the ability of the corporation to obtain *74 loans from outside lending institutions. Hardman v. United States, 827 F.2d 1409, 1412 (9th Cir. 1987).
Each factor must be considered, and no one factor is dispositive. See John Kelley Co. v. Commissioner, 326 U.S. 521, 530, 90 L. Ed. 278, 66 S. Ct. 299 (1946). Although the factors offer an objective measure of the taxpayer's intent, we must examine them in light of all the relevant facts and circumstances. Estate of Chism v. Commissioner, 322 F.2d 956, 960 (9th Cir. 1963), affg. T.C. Memo 1962-6. The Donahues must prove that bona fide loans were created when they transferred the inventory to the corporation, and that the payments they received were repayment of these loans. Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). We examine these facts in light of the objective factors provided to us by the Court of Appeals for the Ninth Circuit.
1. Names Given to the Certificates Evidencing the Indebtedness.
The existence of a promissory note would indicate the intent of the parties to enter into debt. Here, there were no notes issued. Petitioner argues, however, that even though no notes were issued, the purported loans were recorded *75 in the corporate books and accounted for in the financial statements. Although it is true that a separate account was created to track the payments to the Donahues, the nonexistence of an actual debt instrument does not offer support for the existence of debt.
2. The Presence or Absence of a Maturity Date
A fixed or ascertainable maturity date is critical to a determination of true debt. In this case, there was no fixed maturity date by which the corporation had to repay the money. Rather, an open line of credit was extended by Mr. Donahue to the corporation, with only a limit on the amount of credit to be extended. Even though the credit was to cease when the limit was reached, there was no fixed date upon which Mr. Donahue could seek to enforce repayment of the money advanced to the corporation. This factor favors respondent.
3. The Source of the Payments.
Repayments that are dependent solely upon corporate earnings suggest that the intent of the transferor was to make a capital contribution, not to make a bona fide loan. Estate of Mixon v. United States, 464 F.2d 394, 405 (5th Cir. 1972). In this case, petitioner contends the source of the repayments *76 was cash generated by the sale of the inventory and collections from the operation of the business. Thus, repayment was solely dependent upon sufficient earnings by the corporation. This factor favors respondent.
4. Right To Enforce Payment of Principal and Interest.
If the transferee has the unfettered right to enforce repayment, the transaction has indicia of a loan. Here, Mr. Donahue authorized an open line of credit to the corporation, stating no terms of repayment for either the principal or interest. There were no fixed amounts to be repaid each month. In fact, decisions regarding the amount and timing of the payments were left completely to the discretion of the corporation. Because the terms of the extended credit contained no right to enforce the repayment of principal or interest, this factor favors respondent.
5. Participation in Management.
If the Donahues' ownership interest or voting rights increased as a result of the transfer, this suggests a finding of a capital contribution rather than a loan. Hardman v. United States, supra at 1413. Because the Donahues were the sole shareholders of the corporation both before and after the *77 transfer, their ownership interest could neither increase nor decrease. This factor does not weigh in favor of either party.
6. Status Equal to or Inferior to That of Regular Corporate Creditors.
Generally, if a shareholder takes inferior status to third party creditors with regard to a transfer, that transfer is less likely to be classified as debt. Estate of Mixon v. United States, supra at 406. There is nothing in the record to suggest that the Donahues stood in a subordinated position compared to other creditors. We agree with both parties that this factor is of little consequence to the determination of whether true debt exists.
7. Intent of the Parties.
Based on the objective evidence in the record, the Donahues intended these transfers to be true debt. The accounting records and financial statements treat the advances and repayments as debt, and the corporate minutes reflect that Mr. Donahue intended the transfer of inventory, accounts receivable and cash to be a loan. This factor favors petitioners.
8. "Thin" or Adequate Capitalization.
A thinly capitalized corporation is strong evidence that loans are not bona fide debt. This *78 is especially true where a high debt to equity ratio exists. Gyro Engg. Corp. v. United States, 417 F.2d at 439. In late 1988, the Donahues contributed $ 1,000 of initial capital to their newly formed corporation. The debt recorded in the corporate books showed an amount in excess of $ 40,000 as of January 1989. This is a debt-to-equity ratio of approximately 40-to-1. This ratio dropped throughout the years in issue, but it still suggests a finding that the corporation was thinly capitalized from its inception. This factor favors respondent.
9. Identity of Interest Between Creditor and Stockholder.
When the transfer of funds is made by a shareholder in proportion to his or her capital interest, it suggests that the transfer was a contribution to capital. Bauer v. Commissioner, 748 F.2d 1365, 1370 (9th Cir. 1984). In this instance, the Donahues are sole shareholders of the corporation, so any transfers made to Northshore Exxon could not be disproportionate to their capital interest. Northshore Exxon made payments to the Donahues when it was financially able, without regard to their collective ownership of stock. Therefore, this factor does *79 not weigh in favor of either party and is of no consequence.
10. Payment of Interest Only out of "Dividend" Money.
Interest payments are ordinarily important evidence of debt. Berthold v. Commissioner, 404 F.2d at 122; Patrick v. Commissioner, T.C. Memo 1998-30. The Donahues, in this case, made provisions for interest only when the amount exceeded $ 10,000 for more than 6 months. Petitioners argue that they should not be penalized for making use of section 7872(c), which provides for interest-free loans below $ 10,000 when the borrowing is between a corporation and its shareholders. We agree that petitioners should not be penalized for utilizing a legitimate tax provision that affords them favorable treatment. However, the terms of the open line of credit allow for interest free loans in excess of $ 10,000. If the loans were repaid in 6 months, any amount up to $ 75,000 would be interest free. Respondent's assertion is therefore correct that this agreement strongly suggests the Donahues were not expecting to receive substantial interest income from the use of their money. This factor favors respondent.
11. Ability of the Corporation *80 To Obtain Loans From Outside Lending Institutions.
If the corporation is able to obtain loans from outside sources, the transaction has the appearance of a bona fide loan. The shareholder is likely to act in the same manner toward the corporation as a third party creditor would act with respect to the debt. Estate of Mixon v. United States, 464 F.2d at 410. The record does not indicate whether Northshore Exxon was able to borrow money from outside sources. This factor does not weigh in favor of either party.
Upon examination of these 11 factors, we conclude that the payments made by Northshore Exxon to the Donahues are not repayment of bona fide debt. We find that the transfer of equipment, cash and receivables by the Donahues to the corporation was a contribution to capital, not a loan. Fin Hay Realty Co. v. United States, 398 F.2d 694 (3rd Cir. 1968); see sec. 351.
Having found the payments not to be loan repayments, we now address respondent's contentions that the payments made by the corporation to the Donahues are in the nature of compensation for services, or in the alternative, dividends on the stock held by the Donahues. Because the Donahues *81 were in complete control of the corporations' business affairs, close scrutiny must be given to the facts and circumstances so that the true nature of the payments may be determined. Mennuto v. Commissioner, 56 T.C. 910, 921 (1971).
Compensation for Services
In deciding whether the "loan" payments were disguised compensation for services, we look to the intent of the parties. Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1059 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973). In 1990, the employment contracts provided that Mr. Donahue was to receive $ 32,500 and Mrs. Donahue was to receive $ 20,500. In 1991, Mr. and Mrs. Donahue were to receive $ 30,000 and $ 18,000, respectively. However, Mr. Donahue testified that in March 1991, he and his wife took a voluntary wage moratorium to help the corporation recover financially from the effects of the Exxon Valdez oil spill.
The Donahues continued to perform employee services for Northshore Exxon, Mr. Donahue performing substantially more services than Mrs. Donahue due to the opening of Fife Exxon. But the record reflects that the Donahues wanted to stabilize *82 the tenuous financial ground on which their corporation was operating and minimize any further losses to the business. They therefore made the "loan" payments and reduced the debt shown on the corporate balance sheet. We do not believe there was an intent to make these payments to the Donahues in lieu of their wages.
There is no clear correlation between the amount of salary forgone and the shareholder account payable balance. The account balance decreased by $ 4,769 from October 1, 1989 through September 31, 1990. During the next fiscal year ending September 31, 1991, the account balance decreased by $ 17,375, but then increased by $ 786 during the period from October 1 through December 31, 1991. Although the account balance decreased significantly during the period the corporation cut the Donahues' wages, there is evidence suggesting that the intent for the increased payments was to maximize the creditworthiness of the corporation during difficult financial times.
We believe the corporation and the Donahues had legitimate reasons for forgoing their wages and were not attempting to disguise their paychecks as loan repayments. The testimonial and documentary evidence submitted at *83 trial suggests that the reason for the payments was to benefit the corporation, not to compensate the Donahues. We find that there is no other indicium of compensatory intent present to justify recharacterizing the loan repayments as wages.
Corporate Distributions on Stock
We do, however, believe the record supports a finding that the loan repayments were corporate distributions on stock, or constructive dividends. The payments at issue were made by Northshore Exxon to the Donahues not as creditors or as employees. The payments were made to the Donahues because they are the sole shareholders of the corporation.
Constructive dividends can be identified when value passes from the corporation to the shareholder without the shareholder's giving something of substantially equivalent value in return. See United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969). There is nothing in the record to suggest that Northshore Exxon received anything of value from the Donahues as it made each payment. The Donahues contributed property in exchange for all the corporation's stock, so any cash distribution made by the corporation was made as a return on the Donahues' investment *84 in the corporation. Thus, the payments were made to the Donahues in their capacity as shareholders. Sec. 301(a); sec. 1.301-1(c), Income Tax Regs.
The Donahues contend that even if we determine the payments are made to them in their capacity as shareholders, the corporation does not have sufficient earnings and profits during the taxable years in issue to justify treating the payments as dividends. Section 301(a) requires that any distribution made by a corporation "with respect to its stock" shall be subject to dividend treatment for Federal income tax purposes. Secs. 301(c)(1), 316. Any portion of the distribution that does not qualify for dividend treatment shall be applied against the shareholders' basis in their stock, and any excess shall be treated as gain. Sec. 301(c).
The term "dividend" is defined in section 316(a) as:
any distribution of property made by a corporation to its shareholders --
(1) out of its earnings and profits accumulated after February 28, 1913, or
(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during *85 the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.
Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. * * *
Before we address whether Northshore Exxon had sufficient earnings and profits to justify dividend treatment of these distributions, we must determine whether the equipment leases are operating leases, as petitioners contend, or capital leases, as respondent contends. The character of the leases affects any calculation of the corporation's earnings and profits for the taxable years at issue.
Operating Lease Versus Capital Lease
In the notice of deficiency, respondent determined that the equipment leases were really disguised contracts of sale, and should be treated as "return of basis, gain, interest and dividends." In determining whether the agreement is a lease or a contract of sale, we typically consider the intent of the parties, and the legal effect of the contract as it was drafted. Oesterreich v. Commissioner, 226 F.2d 798, 801-802 (9th Cir. 1955), *86 revg. a Memorandum Opinion of this Court.
The mere fact that a transaction is called a lease by the parties does not make it so. Id. We must look at what the parties intended the legal effects of the transaction to be. See Belz Inv. Co. v. Commissioner, 72 T.C. 1209, 1225 (1979) (and cases cited therein), affd. 661 F.2d 76 (6th Cir. 1981). If the corporation intended to acquire an equity interest in the equipment, payments made under the terms of the contract are not deductible business expenses. Western Contracting Corp. v. Commissioner, 271 F.2d 694, 698 (8th Cir. 1959), revg. T.C. Memo 1958-77.
In the instant case, the terms of the contract imposed the risk of loss and damage to the equipment on the corporation, as well as the responsibility to maintain the machinery in good working condition. The corporation paid all taxes on the equipment and was required to hold a liability insurance policy of $ 250,000. The Donahues had no responsibilities with regard to the equipment, but maintained "ownership" status and collected lease payments each month of $ 2,500.
As the sole shareholders and directors of the corporation, *87 the Donahues were in a position to structure the deal in a way that best served their needs. They chose the leasing arrangement. Although there is nothing in the record to show the fair rental value of the equipment, Mr. Donahue testified that the lease payments were sufficient to cover payments of the tow truck and other equipment. The evidence, however, suggests the Donahues intended to transfer their equity interest in the equipment to the corporation after 3 years despite the fact that there was no option to purchase the equipment in the terms of the contract.
As early as June 1989, the corporate minutes show that Mr. Donahue agreed to purchase the equipment himself, lease it to the corporation for 3 years, and ultimately transfer the equipment to the corporation. Throughout the next 3 years, Mr. Donahue consistently manifested his intent to transfer the equipment to the corporation. The corporate minutes offer evidence of this intent. He even proposed a selling price, which was to be the depreciated value of the equipment at the date of sale.
Petitioners rely on the Western Contracting Corp. v. Commissioner, supra, to support their position that their leasing *88 agreement is not a capital lease because the corporation had no legal right to enforce the sale of the equipment. We find this case distinguishable from the present case for two reasons. First, in Western Contracting, the negotiations between the lessor and lessee were at arm's length. It was not between the sole shareholders of a corporation and the corporation itself, as is the situation currently before us. Second, there was no evidence of a side agreement between the parties for the sale of the equipment. Here, the record contains three different documents which indicate a side agreement to transfer the equipment at the end of the lease. [5]
We find *89 that the 1990 and 1991 leases entered into between the Donahues and Northshore Exxon are indeed capital leases, and payments made under the leases may not be deducted as operating lease expenses.
Earnings and Profits
Petitioners, through their accountant, provided their own calculation of earnings and profits (E & P) at trial. This calculation includes both the earnings from Northshore Exxon as a C corporation and as an S corporation.
Earnings and profits are not defined in the Internal Revenue Code, but have been described by the courts as an economic term used to "'approximate a corporation's power to make distributions which are more than just a return of investment.'" Henry C. Beck Co. v. Commissioner, 52 T.C. 1, 6 (1969) (quoting Albrecht, "Dividends and Earnings or Profits," 7 Tax L. Rev. 157, 183), affd. per curiam 433 F.2d 309 (5th Cir. 1970) (fn. ref. omitted). All income exempted by statute or otherwise nontaxable by the Federal government is included in E & P. Sec. 1.312-6(b), Income Tax Regs. Earnings and profits also include certain deductions that would not otherwise be recognized in calculating *90 taxable income. Sec. 1.312-7(b), Income Tax Regs.
The E & P calculation provided by petitioners includes a proposed dividend adjustment for the taxable year 1989 allegedly made by respondent. At trial, respondent objected to the use of petitioners' worksheet on the grounds that it was flawed in numerous respects. One item objected to by respondent is a reduction of E & P in petitioners' calculations for FYE September 30, 1989, to reflect an adjustment by respondent's examining agent for a dividend in that year. Respondent points out that FYE September 30, 1989, was not a taxable year examined by the revenue agent.
We agree that the E & P statement submitted by petitioners is flawed. We reject petitioners' conclusion that respondent proposed to adjust corporate earnings for a constructive dividend in 1989 in the amount of $ 20,029.
The Court has reconstructed Northshore Exxon's earnings and profits for FYE September 30, 1990 and 1991. We begin by taking the corporation's taxable income as shown on the Federal tax returns and adding the proper adjustments to taxable income as determined by respondent. We deducted Federal income taxes, penalties, and travel *91 and entertainment expenses to the extent they exceed the deduction otherwise allowable for tax purposes. [6] *92 Based on our findings as well as Northshore Exxon's Federal income tax returns, we find Northshore Exxon's available E & P to be:
Taxable Year Ending September 30, 1990
Taxable income as shown on return
$ 6,968
Increase in taxable income[1]
23,259
Federal income tax[2]
(4,534)
Penalties
(302)
Travel & entertainment
(23)
Net earnings
25,368
Accumulated earnings from 1989
8,030
The distributions paid to the Donahues during the taxable year ending September 30, 1990, were in the amount of $ 18,170. [7] Corporate distributions shall be made out of current and accumulated E & P. Sec. 316(a). Based on the above calculations, there is sufficient current E & P to support complete dividend treatment of the corporate distributions.
To determine whether there is sufficient E & P to justify dividend treatment for the distribution made in the taxable year ending September 30, 1991, we make the following calculations:
Taxable Year Ending September 30, 1991
Taxable income as shown on return
$ 22,276
Increase in taxable income[1]
27,656
Federal income tax[2]
(4,628)
Penalties
(451)
Travel & entertainment
(64)
Net earnings
44,789
Accumulated earnings from 1990
15,228
*93 The distribution from Northshore Exxon to the Donahues during taxable year ending September 30, 1991, is $ 56,791. [8] The current earnings for this fiscal year are not sufficient to completely cover this distribution, so the first $ 44,789 comes from current earnings, and the remaining $ 12,002 comes out of accumulated earnings. Sec. 316(a). Therefore, the entire distribution must be treated as a dividend to the Donahues.
Reviewed and adopted as the report of the Small Tax Case Division.
To reflect the foregoing,
Decision will be entered under Rule 155. Footnotes
1. Section references are to the Internal Revenue Code in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. M B & B, Inc. was originally incorporated in the name of Northshore Exxon, Inc. In November 1988, Northshore Exxon, Inc. changed its corporate name to M B & B, Inc., but continued to do business as Northshore Exxon.↩
3. Respondent concedes the $ 6,569 adjustment to Northshore Exxon's gross receipts for the taxable year ending Sept. 30, 1991, as well as the $ 2,278 adjustment to the Donahues' 1991 Schedule C wage expense. Northshore Exxon concedes the $ 1,724 adjustment to rental expenses, the $ 1,000 adjustment to utility expenses, and the $ 1,393 adjustment to the corporation's advertising expenses for the period ending Sept. 30, 1991. The $ 846 adjustment to advertising expenses and the $ 2,824 adjustment to utility expenses for the period ending Dec. 31, 1991, have also been conceded by petitioners in their reply brief.↩
4. Ms. Bjorkman is not a certified public accountant.↩
5. These documents are the corporate minutes from June 1, 1989, June 1, 1990, and August 15, 1991. The minutes from June 30, 1992, also indicate such an intent, but 1992 is not a taxable year in issue. We decline to consider the June 30, 1992, document as evidence because it is not relevant to show the intent of the taxpayer for the taxable years in issue.↩
6. See Bittker et al., Federal Income Taxation of Corporations and Shareholders, sec. 8.03(6) (6th ed. 1997).
1. Increase in taxable income for taxable year October 1, 1989 through September 30, 1990, is due to the recharacterization of the operating leases to capital leases. The notice of deficiency reflects that the disallowance of the equipment rental expense increases taxable income by $ 32,873, then reduces it by $ 5,722 for allowable depreciation and $ 3,892 for allowable interest deemed to have been paid on the capital lease payment.↩
2. Northshore Exxon's Federal income tax return indicate that $ 1,045 in Federal income tax was paid for the taxable year ending September 30, 1990. We have increased this number by $ 3,489, the additional tax due as stated in the notice of deficiency.↩
7. The Donahues received this distribution due to the recharacterization of the operating leases as capital leases.↩
1. Increase in taxable income for taxable year October 1, 1990 through September 30, 1991, is due to the recharacterization of the operating leases as capital leases. The notice of deficiency reflects that the disallowance of the cost of goods sold/equipment rental expense increases taxable income by $ 34,737, then reduces it by $ 6,912 for allowable depreciation and $ 838 for allowable interest deemed to have been paid on the capital lease. The notice of deficiency also provides for a $ 19,076 deduction for wages. We do not include this reduction in our E & P calculation because we determined that the purported loan payments were really constructive dividends, not disguised wage payments. Northshore Exxon conceded the additional upward adjustments of $ 1,393 for disallowed advertising expenses and $ 1,000 for disallowed utility expenses, and conceded a downward adjustment to taxable income for $ 1,724 for additional rental expenses.↩
2. Schedule M-2 of Northshore Exxon's Federal income tax return for taxable year ending September 30, 1991, shows the Federal income tax paid to be $ 955. However, Schedule J, Line 10 indicates that the total Federal income tax for this year is $ 3,341. The Accumulated Earnings Analysis provided by petitioners also indicates that the total income tax for this period is $ 4341. After examining all the evidence in the record, we conclude that the total income tax paid in this year is $ 4,341, not $ 955. We have increased this amount by $ 1,287, the additional tax due as stated in the notice of deficiency taking into account concessions by respondent for adjustments to Northshore Exxon's gross receipts.↩
8. The Donahues received a distribution in the amount of $ 29,576 from the recharacterization of their debt to equity, and $ 27,215 from the recharacterization of the operating leases to capital leases.↩